**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

---------------------------------------------------------- :
                                             :

| | |
|---|---|
|   | : |

**Roger L. Saunders,**
    **Plaintiff**

**vs.**


**Clark Briner, Revere Capital, LLC – Texas**
**and Revere Capital, LLC – Connecticut,**
    **Defendants**

**CIVIL ACTION**
**NO. 3:13CV-705 (AVC)**



**MAY 29, 2013**

---------------------------------------------------------- :

**Clark Briner, Revere Capital, LLC (Texas)**
**Revere Capital Management, LLC,**
**Revere High Yield Fund, L.P. and**
**Revere GP, LLC**
    **Counterclaim Plaintiffs**

**vs.**

**Roger Saunders, Sloan Saunders, Saunders**
**Capital, LLC, Cedar Hill Holdings, LLC, and**
**Evan Woolley, Revere Investments, LLC,**
**Revere High Yield GP, LLC and Revere High**
**Yield Debt Fund, L.P.**
    **Counterclaim Defendants**

----------------------------------------------------------

**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM**

**ANSWER OF DEFENDANTS, CLARK BRINER, REVERE CAPITAL, LLC (TEXAS),**
**REVERE CAPITAL, LLC (CONNECTICUT), REVERE CAPITAL MANAGEMENT,**
**LLC AND REVERE HIGH YIELD FUND, L.P.**

The Defendants, Clark Briner, Revere Capital, LLC (Texas), Revere Capital, LLC

(Connecticut), Revere Capital Management, LLC and Revere High Yield Fund, L.P. (jointly the

"Answering Defendants") answer the Amended Verified Complaint ("Complaint") of Roger L. Saunders dated April 17, 2013 as follows:

1.      The Answering Defendants deny the allegations of Paragraph 1 of the Complaint.

2-6.    The Answering Defendants admit the allegations of Paragraphs 2 through 6 of the Complaint.

7.      The Answering Defendants have insufficient information or knowledge upon which to form a belief as to the truth of the allegations contained in Paragraph 7 of the Complaint and, therefore, leave the Plaintiff to his proof.

8-9.    The Answering Defendants admit the allegations of Paragraphs 8 and 9 of the Complaint.

10.     As to so much as Paragraph 10 alleges:  (a) "On or around February 26, 2009, the limited liability company Revere Investments was formed"; and (b) "and Defendant Revere Capital (Texas), which is wholly owned by Briner, owned the remaining fifty percent (50%) of Revere Investments": Admitted. As to the balance of Paragraph 10:  Denied.

11.     Denied. *See* Counterclaim ¶¶ 18-31.  The Plaintiff's characterization of the terms of a writing, which speaks for itself, is neither admitted nor denied, and therefore the Plaintiff is left to his proof.

12.     The Answering Defendants deny the allegations of Paragraph 12 of the Complaint.

13.     As to so much as Paragraph 13 alleges:  "Briner is the sole owner, member, and manager of Revere Capital Texas": Admitted. As to the balance of Paragraph 13:  Denied.

14.    As to so much as Paragraph 14 alleges: "a discretionary real estate debt fund organized under the laws of the State of Delaware": The Answering Defendants have insufficient information or knowledge upon which to form a belief as to the truth of these allegations and, therefore, leave the Plaintiff to his proof. As to the balance of Paragraph 14: admitted.

15.    Denied. *See* Counterclaim ¶¶ 18-31; 57-71.

16.    As to so much as Paragraph 16 alleges: "To the extent the Fund could not originate the entire loan, investor money was raised on a co-investment basis": Admitted. As to the balance of Paragraph 16: Denied. *See* Counterclaim ¶¶ 45-56; 78-103.

17-18.    The Answering Defendants deny the allegations of Paragraphs 17 and 18 of the Complaint.

19.    The Plaintiff's characterization of the terms of a writing, which speaks for itself, is neither admitted nor denied, and therefore the Plaintiff is left to his proof.

20.    Denied. *See* Counterclaim ¶¶ 142-146.

21-51.    The Answering Defendants deny the allegations of Paragraphs 21 through 51 of the Complaint.

## COUNT ONE

### (Action for Dissolution as to Revere Investments and Revere GP – Conn. Gen. Stat. § 33-880 through 903)

1-51.    The answers to Paragraphs 1 through 51 are hereby incorporated as answers to Paragraphs 1 through 51 of this Count One.

3

52-54. The Answering Defendants admit the allegations of Paragraphs 52 through 54 of the Complaint.

55.     The Answering Defendants deny the allegations of Paragraph 55 of the Complaint.

## COUNT TWO

### (Common Law Fraud as to Defendants Briner and Revere Capital Texas, and Revere Capital Connecticut)

1-55.   The answers to Paragraphs 1 through 51 are hereby incorporated as answers to this Count Two.

56-59   The Answering Defendants deny the allegations of Paragraphs 56 through 59 of the Complaint.

## COUNT THREE

### (Breach of Revere Investments Operating Agreement as to Revere Capital Texas)

1-59.   The answers to Paragraphs 1 through 51 are hereby incorporated as answers to this Count Three.

60.     Denied.  The original parties to the Revere Investments Operating Agreement were Sloan Saunders and Revere Capital, LLC.  Roger Saunders later acquired a membership interest. *See* Counterclaim ¶ 109-110.

61-63. The Answering Defendants deny the allegations of Paragraphs 61 through 63 of the Complaint.

## COUNT FOUR

**(Breach of Covenant of Good Faith and Fair Dealing as to Revere Capital Texas)**

1-63.   The answers to Paragraphs 1 through 51 are hereby incorporated as answers to this Count Four.

64.     Denied.  The original parties to the Revere Investments Operating Agreement were Sloan Saunders and Revere Capital, LLC.  Roger Saunders later acquired a membership interest. *See* Counterclaim ¶ 109-110.  As to so much as Paragraph 64 as alleges: "reasonably expected to receive certain benefits":  The Answering Defendants have insufficient information or knowledge upon which to form a belief as to the truth of these allegations and, therefore, leave the Plaintiff to his proof.

65-67.  The Answering Defendants deny the allegations of Paragraphs 65 through 67 of the Complaint.

## COUNT FIVE

**(Breach of Revere GP Limited Liability Company Agreement as to Defendant Briner)**

1-67.   The answers to Paragraphs 1 through 51 are hereby incorporated as answers to this Count Five.

68-70.  The Answering Defendants deny the allegations of Paragraphs 68 through 70 of the Complaint.

## COUNT SIX

### (Breach of Covenant of Good Faith and Fair Dealing as to Briner)

1-70.   The answers to Paragraphs 1 through 51 are hereby incorporated as answers to this Count Six.

71.   As to so much as Paragraph 71 alleges: "Saunders and Briner were parties to a Revere GP Operating Agreement": Admitted.  As to the balance of Paragraph 71:  The Answering Defendants have insufficient information or knowledge upon which to form a belief as to the truth of these allegations and, therefore, leave the Plaintiff to his proof.

72-74.  The Answering Defendants deny the allegations of Paragraphs 72 through 74 of the Complaint.

## COUNT SEVEN

### (Violation of Connecticut Uniform Securities Act as to Briner, Revere Capital Texas, and Revere Capital Connecticut)

1-74.   The answers to Paragraphs 1 through 51 are hereby incorporated as answers to this Count Seven.

75-80.  The Answering Defendants deny the allegations of Paragraphs 75 through 80 of the Complaint.

## COUNT EIGHT

### (Violation of Connecticut Unfair Trade Practices Act as to Briner, Revere Capital Texas, and Revere Capital Connecticut)

1-80.    The answers to Paragraphs 1 through 51 are hereby incorporated as answers to this Count Eight.

81.    Such legal conclusion is neither admitted nor denied, but the Plaintiff is left to his proof.

82-87.    The Answering Defendants deny the allegations of Paragraphs 82 through 87 of the Complaint.

## COUNT NINE

### (Breach of Fiduciary Duty as to Revere Capital Texas)

1-87.    The answers to Paragraphs 1 through 51 are hereby incorporated as answers to this Count Nine.

88.    Such legal conclusion is neither admitted nor denied, but the Plaintiff is left to his proof.

89-90.    The Answering Defendants deny the allegations of Paragraphs 89 through 90 of the Complaint.

## COUNT TEN

### (Breach of Fiduciary Duty as to Briner)

1-90.    The answers to Paragraphs 1 through 51 are hereby incorporated as answers to this Count Ten.

91.     Such legal conclusion is neither admitted nor denied, but the Plaintiff is left to his proof.

92-93.  The Answering Defendants deny the allegations of Paragraphs 92 and 93 of the Complaint.

## COUNT ELEVEN

**(Fraudulent Inducement by Briner, Revere Capital Texas, and Revere capital Connecticut)**

1-93.   The answers to Paragraphs 1 through 51 are hereby incorporated as answers to this Count Eleven.

94-97.  The Answering Defendants deny the allegations of Paragraphs 94 through 97 of the Complaint.

## COUNT TWELVE

**(Fraud by Briner, Revere Capital Texas, and Revere Capital Connecticut)**

1-97.   The answers to Paragraphs 1 through 51 are hereby incorporated as answers to this Count Twelve.

98-99.  The Answering Defendants deny the allegations of Paragraphs 98 and 99 of the Complaint.

100.    As to so much as Paragraph 100 alleges:  "It was reasonable for Saunders to rely upon Briner, Revere Capital Texas, and Revere Capital Connecticut because they were in a position of trust and control":  Denied.  As to the balance of Paragraph 101:  The Answering

Defendants have insufficient information or knowledge upon which to form a belief as to the truth of these allegations and, therefore, leave the Plaintiff to his proof.

101.    The Answering Defendants deny the allegations of Paragraph 101 of the Complaint.

## COUNT THIRTEEN

### (Statutory Theft as to as to Briner, Revere Capital Texas, Revere Capital Connecticut, Revere Management and Fund II)

1-101. The answers to Paragraphs 1 through 51 are hereby incorporated as answers to this Count Thirteen.

102-105.      The Answering Defendants deny the allegations of Paragraphs 102 through 105 of the Complaint.

## COUNT FOURTEEN

### (Conversion of Funds as to Briner, Revere Capital Texas, and Revere Capital Connecticut)

1-105. The answers to Paragraphs 1 through 51 are hereby incorporated as answers to this Count Fourteen.

106-108.      The Answering Defendants deny the allegations of Paragraphs 106 through 108 of the Complaint.

## COUNT FIFTEEN

**(Unfair Competition and False Advertising Under the Lanham Act Against Briner, Revere Capital Texas, Revere Capital Connecticut, Revere Management and Fund II)**

1-108.  The answers to Paragraphs 1 through 51 are hereby incorporated as answers to this Count Fifteen.

109.  Such legal conclusion is neither admitted nor denied, but the Plaintiff is left to his proof.

110-116.  The Answering Defendants deny the allegations of Paragraphs 110 through 116 of the Complaint.

## COUNT SIXTEEN

**(Facilitation of Breach of Fiduciary Duty against Madison Mott, Inc.)**

The Answering Defendants do not respond to Count Sixteen as it is not directed against any of them.

## COUNT SEVENTEEN

**(Violation of Connecticut Unfair Trade Practices Act to as Madison)**

The Answering Defendants do not respond to Count Seventeen as it is not directed against any of them.

## AFFIRMATIVE DEFENSES OF DEFENDANTS, CLARK BRINER, REVERE CAPITAL, LLC (TEXAS), REVERE CAPITAL, LLC (CONNECTICUT), REVERE CAPITAL MANAGEMENT, LLC AND REVERE HIGH YIELD FUND, L.P.

1.  *First Affirmative Defense*:  Material Breach

The Plaintiff's claims of breach of contract and breach of the implied covenant of good faith and fair dealing are barred by his own material breaches of contract.

 2. *Second Affirmative Defense*: Estoppel

The Plaintiff's claims are barred by the doctrine of estoppel.

 3. *Third Affirmative Defense*: Fraud in the Inducement

The Plaintiff's claims are barred in that and insofar as the contracts and agreement on which the Plaintiff bases his claims were induced by the Plaintiff's fraudulent misrepresentation.

 4. *Fourth Affirmative Defense*: Duress

The Plaintiff's claims are barred in that and insofar as the contracts and agreement on which the Plaintiff bases his claims were the product of duress.

 5. *Fifth Affirmative Defense*: Statute of Limitations (Conn. Gen. Stat. § 52-577)

The Plaintiff's fraud, "fraudulent inducement," breach of fiduciary duty, conversion and statutory theft claims are barred, in whole or in part, by the statute of limitations, Conn. Gen. Stat. § 52-577.

 6. *Sixth Affirmative Defense*: Statute of Limitations (Conn. Gen. Stat. § 42-110g(f))

The Plaintiff's Connecticut Unfair Trade Practices Act claims are barred, in whole or in part, by the statute of limitations, Conn. Gen. Stat. § 42-110g(f).

 7. *Seventh Affirmative Defense*: Statute of Limitations (Conn. Gen. Stat. § 52-581)

The Plaintiff's claims of breach of contract and breach of the implied covenant of good faith and fair dealing are barred, in whole or in part, by the statute of limitations, Conn. Gen. Stat. § 52-581.

8.     *Eighth Affirmative Defense*:  Unclean Hands

The Plaintiff's claims are barred by the doctrine of unclean hands.

9.     *Ninth Affirmative Defense*:  Waiver

The Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver.

10.    *Tenth Affirmative Defense*:  Failure to State a Claim

The Plaintiff's claims are barred in that he has failed to state a claim on which relief can

be based.

## VERIFIED COUNTERCLAIM

### INTRODUCTION

This is a counterclaim pursuant to Fed. R. Civ. P. 13 and 20(a)(2)(B) by the

Defendants/Counterclaim Plaintiffs, Clark Briner (for himself and by way of derivative action on

behalf of Revere High Yield GP, LLC and Revere High Yield Debt Fund, L.P.), Revere Capital,

LLC (Texas) (for itself and by way of derivative action on behalf of Revere Investments, LLC),

Revere Capital Management, LLC and Revere High Yield Fund, L.P. against the

Plaintiff/Counterclaim Defendant, Roger Saunders and against the additional, prospective

Counterclaim Defendants Sloan Saunders, Saunders Capital, LLC, Cedar Hill Holdings, LLC,

Evan Woolley and, nominally for purposes of the derivative claims only, Revere Investments,

LLC, Revere High Yield GP, LLC and Revere High Yield Debt Fund, L.P.

**PARTIES**

1.      The Counterclaim Plaintiff, Clark Briner ("Briner") is, and at all relevant times has been, an individual having a principal place of residence at 167 Long Neck Road, Darien, CT 06820.

2.      The Counterclaim Plaintiff, Revere Capital, LLC (Texas) ("Revere Capital") is, and at all relevant times has been, a Texas limited liability company with a principal address of 20 Ketchum Street, Westport, CT 06880.

3.      The Counterclaim Plaintiff, Revere Capital Management, LLC ("RCM") is, and at all relevant times has been, a Connecticut limited liability company with a principal address of 20 Ketchum Street, Suite 100, Westport, CT 06880.

4.      The Counterclaim Plaintiff, Revere High Yield Fund, L.P. (the "Hedge Fund") is, and at all relevant times has been, a Delaware limited partnership with a principal address of 20 Ketchum Street, Westport, CT 06880.

5.      The Counterclaim Plaintiff, Revere GP, LLC ("Revere GP") is a Connecticut limited liability company with a principal address of 20 Ketchum Street, Suite 100, Westport, CT 06880.

6.      The Counterclaim Defendant, Roger Saunders ("Roger Saunders") is, and at all relevant times has been, an individual whose principal place of residence is at 145 East 74th Street, Apt. 2A, New York, NY 10021.

7.    The Counterclaim Defendant, Sloan Saunders ("Sloan Saunders") is, and at all relevant times has been, an individual whose principal place of residence is at 124 East 79th Street, Apt. 15A, New York, NY 10075

8.    The Counterclaim Defendant, Saunders Capital, LLC ("Saunders Capital") is, and at all relevant times has been, a Connecticut limited liability company claiming an address of 106 Mariomi Road, New Canaan, CT 06840.

9.    The Counterclaim Defendant, Cedar Hill Holdings, LLC ("Cedar Hill") is, and all relevant times has been, a New York limited liability company with a principal address of 124 East 79th Street, Apt. 15A, New York, NY 10075.

10.    The Counterclaim Defendant, Evan Woolley is, and at all relevant times has been, an individual whose principal place of residence is at 39 Plaza Street, W., Apt. 11C, Brooklyn, NY 11217.

11.    The Counterclaim Defendant, Revere Investments, LLC ("Revere Investments") is a nominal defendant for purposes of a derivative action pursuant to Fed. R. Civ. P. 23.1 and is, and at all relevant times has been, a Connecticut limited liability company with a principal place of business at 20 Ketchum Street, Suite 100, Westport, CT 06880.

12.    The Counterclaim Defendant, Revere High Yield Debt Fund, L.P. is a nominal defendant for purposes of a derivative action pursuant to Fed. R. Civ. P. 23.1 and is, and at all relevant times has been, a Delaware partnership with a principal place of business at 20 Ketchum Street, Suite 100, Westport, CT 06880.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 due to the existence of a federal question and otherwise pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 as Plaintiffs' claims arise in this District and at least a substantial part of the events or omission giving rise to the claims occurred in this District.

## FACTS GENERALLY COMMON TO ALL COUNTS

### *Background*

15.     Since 1999 Briner has been involved in the business of investing in real estate and making, investing in, and managing real estate loans, among other pursuits.  Briner's experience in the real estate loan business has encompassed finding (or "sourcing") loan opportunities, underwriting loans, raising capital for loans, and closing, managing and collecting loans, all focused in what is known as the "bridge," "hard money" or "high yield" segment of the real estate loan business.  These terms are sometimes understood to mean short term loans secured by real estate having generally higher interest rates, and generally higher risk, than conventional real estate loans made by commercial banks.  The term "high yield loan" will be used here in this sense.

16.     In 2006 Briner formed Revere Capital as a vehicle for real estate loans and real estate investments.  Revere Capital at all times has been owned and controlled solely by Briner.

17.    Between 2007 and 2010 Briner was employed as a senior investment banker at Deutsche Bank, where he became acquainted with Sloan Saunders, a junior analyst in Deutsche Bank's real estate investment banking group.

*Formation of Revere Investments*

18.    In or about 2008, Sloan Saunders introduced Briner to his father, Roger Saunders, who, like Briner, was engaged in the high yield real estate loan business.

19.    Thereafter, Briner, Roger Saunders and Sloan Saunders discussed the formation of a partnership that would combine the resources and experience of Briner and Roger Saunders in the high yield real estate loan business.

20.    On or about February 26, 2009 Briner – through Revere Capital – and Sloan Saunders individually as sole members formed Revere Investments.  Thereafter, Briner and Sloan Saunders executed an Operating Agreement of Revere Investments, a copy of which is attached as Exhibit A and incorporated here by reference (the "Revere Investments Operating Agreement").

21.    The Revere Investments Operating Agreement provided that Revere Capital and Sloan Saunders were each fifty percent members having equal voting rights.  The Revere Investments Operating Agreement, further, named Briner and Sloan Saunders as co-managers with equal management rights.

22.    The effect of the foregoing – and the intention of the parties – was that no decision could be made and no action could be taken by Revere Investments over the objection of either Briner or Sloan Saunders.

23.     Section 5.4 of the Revere Investments Operating Agreement provides in part that:

> No Member shall compete with the Company by owning, being employed by, consulting for and/or participating in a business relating to high yield and hard money first and second mortgage lending without the consent of a Supermajority Vote of the Members; provided however, in the event the Company elects not to pursue an opportunity nothing herein shall prevent a member from pursing an opportunity outside of the company.  .  . furthermore, no Member or Manager shall solicit, for purposes other than business that directly benefits the Company only, the broker, deal flow or funding relationships learned from or introduced by any other Member or Manager.  (For the purposes of the foregoing sentence, relationships learned from or introduced by Roger Saunders shall be deemed to be learned from or introduced by Sloan Saunders.)

24.     It was expressly and/or implicitly understood that no party could circumvent the non-competition and non-solicitation provisions stated in ¶ 23 above through competition by or through agents, affiliates or immediate family members.  Accordingly, Briner understood that, although the non-competition provision contained in Section 5.4 applied by its literal terms only to Revere Capital, he individually, and his agents, affiliates and immediate family members were bound by it.  Similarly, the parties understood that it bound not only Sloan Saunders but also Roger Saunders, and also their agents, affiliates and immediate family members.

25.     Section 10.1(f) of the Revere Investments Operating Agreement further provides that:

> Notwithstanding any other provisions of this Agreement, Sloan Saunders shall have the right to transfer any or all of his interests in the Company to his father, Roger Saunders, and thereafter, Roger Saunders shall have the right to transfer any or all of such interest to Sloan Saunders, without the requirement of consent from any other party.

26.     Both Briner and Roger Saunders had substantial experience in both sourcing *and* raising capital for high yield real estate loans.

27.     Sloan Saunders had little or no experience in the high yield loan business, but had experience as an analyst for Deutsche Bank. He also had free time having been laid off in June 2008.

28.     It was mutually agreed among Briner, Roger Saunders and Sloan Saunders that, Sloan Saunders would be primarily responsible for day-to-day operational tasks, such as setting up and maintaining accounting systems and templates, asset management, investor services and compliance.

29.     Sloan Saunders further represented that he would work diligently and effectively to raise capital through what he represented to be his network of high net worth acquaintances.

30.     In connection with the matters described in ¶¶ 18-29 above, Clark Briner and Revere Capital, on one side, and Roger Saunders and Sloan Saunders on the other side, intended to associate with each other, as co-owners, to carry on a business for profit. These parties at all times understood and intended that, in regard to this arrangement, Roger Saunders and Sloan Saunders would act as agents for each other. (The word "partnership" will be used here to describe the arrangement between the Briner side and the Saunders side notwithstanding that Revere Investments was formed as a limited liability company. The word "side" in the context of the "partnership" will be used here to encompass not only the members of Revere Investments but also Briner and both Sloan and Roger Saunders and their respective family members and agents. Roger and Sloan Saunders will sometimes be referred to jointly as "the Saunders.")

31.     At the request of Briner, the below-quoted Sections 5.8 and 5.9 were included in

the Revere Investments Operating Agreement:

> Section 5.8 – Work Performed by Only One Initial Manager. The parties
> acknowledge that the Company's business model presupposes that the
> Company's management will require the services of both the Initial
> Managers. Therefore, notwithstanding any other provision of this
> Agreement, in the event that one Manager resigns or ceases to act as
> Manager, the other Manager shall be entitled to a monthly fee, payable by
> the Company to the Manager who remains with the Company until all
> active investments have been sold or resolved. The payment will be equal
> to one-twelfth of one percent (1/12 of 1%) percent of the Company's
> aggregate unpaid balances of all mortgages owned or serviced by the
> Company, measured on the last day of each month, commencing the
> month in which such Manager has resigned, and payable by the fifteenth
> (15th) day of the immediately preceding month.

> Section 5.9 – Good Faith Efforts. The Managers agree that they shall
> cooperate in good faith in the matters of the Company, and that the
> Managers shall put forth reasonably equal effort in the transaction of
> business for the Company. The Managers agree that it is the intent of this
> Agreement and the governance of the Company that both Managers be
> equally engaged and involved in management of the Company.

*February 2009 – October 2010:  Revere Investments Starts Up (Slowly) – and it Becomes
Increasingly Apparent that the Saunders are not Willing to Devote Equal Efforts*

32.     In its first twenty-one months of operations, from its formation in February 2009

through November 2010, Revere Investments made four loan investments, in the total principal

amount of approximately $3.8 million.

33.     In July 2010 Sloan Saunders informed Briner that he had accepted a full time

position with another real estate investment fund, Ranieri Partners.

34.     In connection with his announcement that he had accepted full time employment

outside Revere Investments, Sloan Saunders represented to Briner that he would continue to

assist on a part-time basis and that Roger Saunders would take over the balance of his operational and management responsibilities.

35.    Despite Sloan Saunders' representations as described in ¶ 34 above, at no time did the Saunders side contribute time or effort to the affairs of Revere Investments remotely equal in the aggregate to that contributed by Briner.

*Briner Does 95% of the Work, Raises 95% of the Capital, Sources Half the Deals, the Business Grows, and the Saunders Get Half the Profits (and More)*

36.    After July 2010 the imbalance of time and effort became even more pronounced. That imbalance continued throughout the period in which Revere Investments was active. Roger Saunders has been in Revere Investments' offices in total no more than five times. After July 2010, Sloan Saunders worked a total of one half-day in the office. During that period he also worked on Revere Investments business outside the office for approximately two to four hours per month on average. Through the Saunders abdication of their obligation to devote equal efforts, it was thus left to Briner by default to oversee all day-to-day operations, including oversight of loan administration, bookkeeping, underwriting, compliance, and investor relations, as well as raising 95% of the capital, sourcing about half the loans, and closing most of the loans. In total, as of the time the litigation was commenced, Briner had devoted over 6,200 hours to the business of Revere Investments compared to less than 200 hours from the Saunders side.

37.    At all times in and after July 2010, Sloan Saunders has ceased to "act as Manager" within the meaning of Section 5.8 of the Revere Investments Operating Agreement (quoted in ¶ 31 above). From July 2010 to this date the monthly fee provided for, and calculated

in accordance, with Section 5.8, exceeds $260,000 in total.  Such fee has not been paid to Revere Capital.

38.     At all times Roger Saunders and Sloan Saunders have had full access along with Briner to all office facilities and all books, records, bank accounts and checkbooks of Revere Investments, including online access to Revere Investments' Quick Books accounts.  One or both of the Saunders regularly availed themselves of this access.

39.     In or about August 2011, following one of several conversations in which Briner took issue with the relative lack of effort and time expended by the Saunders side, Sloan Saunders and Briner agreed that, notwithstanding that both sides of the partnership held equal fifty percent interests, a monthly management fee that Revere Investments was entitled to receive from the Fund – described more fully in ¶ 78 below – would be allocated 85% to Briner, with the balance of 15% to be retained by Revere Investments.

40.     Following the agreement referred to in ¶ 39 above, the management fee – which previously had been paid 50% to Revere Capital and 50% to Sloan Saunders – was paid 85% to Revere Capital and zero to Sloan Saunders, with the knowledge and consent of Sloan and Roger Saunders, and without protest by them until December 2012, when they repudiated such agreement.

41.     In October 2010 Briner resigned his position with Deutsche Bank to devote full time efforts on behalf of Revere Investments.

42.    In late 2010 Briner secured office space in Norwalk, Connecticut for Revere Investments and took on the bulk of the responsibility of hiring staff to continue the process of growing Revere Investments.

43.    Revere Investments became more active after October 2010, closing four loans in December 2010.

44.    In late 2010, Briner suggested formation of an investment fund as a way to continue to grow the business of Revere Investments.  Such a fund was thereafter formed, as discussed more fully in ¶¶ 45-56 below.

*How Capital was Raised – and How that Created Opportunities for Self-dealing by the Saunders*

45.    Loan investments were financed by various combinations of money invested by Briner, Sloan Saunders and Roger Saunders, their respective family members or – in the case of Roger Saunders – his self-directed pension plan (all of which will be referred to here as "Owner Capital") and money invested by others ("Outside Capital").  The proportion of Owner Capital and Outside Capital used to fund loan investments varied from deal to deal.

46.    Before February 2011, Outside Capital was invested, whether directly or through pooled investments, into individual loans through participation interests in which the participant-investor would be entitled, to the extent of loan proceeds, to a specified fixed rate of return on invested capital plus return of capital.

47.    The rate of return paid on Outside Capital under the arrangements described in ¶ 46 above was usually less than the interest rate paid by the borrower on the underlying loan investment, so that there would be a profit equal to the difference between the interest rate paid

by the borrower and the rate of return payable to the investor. (This form of profit will be referred to here as the "Interest Rate Spread Profit").

48.     In addition to Interest Rate Spread Profit, Outside Capital typically did not participate in profit related to certain fees – known as "points" and "exit fees" – that Revere Investments charged its borrowers. (As used here, the term "points" refers to a fee, calculated based on a specified percentage of the principal amount of loan, that was charged by Revere Investments as part of the consideration for a loan. The term "points," as used here, refers only to a fee that becomes an obligation of the borrower as of the date a loan was made. The term does not refer to a fee obligation owed by a borrower that arises only upon maturity of a loan, which will be referred to here as an "exit fee"). Revere Investments charged points, in varying percentages, in connection with most of its loans. In all cases where points were charged the points were financed by Revere Investments as part of a loan, so that Revere Investments did not advance to the borrower the full principal amount of the loan, but advanced the principal amount less the points. In a few cases, Revere Investments charged an "exit fee" in lieu of or in addition to "points." In all cases Revere Investments charged points and/or an exit fee. Since Outside Investors typically invested on a "net" basis – meaning they were entitled to a return of the amount they actually funded plus a fixed return on that amount (i.e., their investments were typically not "grossed up" to give them a share of points)  –  in such cases Revere Investments would retain all points (and exit fees if any) and would retain all interest on points. Accordingly, there would be profit earned with respect to Outside Capital equal to interest on points ("Interest-

on-Points Profit") and, upon full repayment of the loan, the points themselves and/or any exit fee ("Points Profit").

49.     As alleged in ¶ 23 above, Section 5.4 of the Revere Investments' Operating Agreement prohibits the parties – understood by express and/or implicit agreement to include family members, agents, designees, and affiliates of members – from competing with Revere Investments without the consent of a "supermajority vote of the Members." "Supermajority Vote" is defined in Article One as "one or more Company Interest of members which taken together exceed seventy-five percent of the aggregate of all Company Interests." Accordingly, no debt investments could be made by either the Saunders side or the Briner side of the partnership in competition with the partnership without the consent of the other side.

50.     Consistent with both the foregoing and the fiduciary duty of loyalty they each owed to the partnership and to each other, Briner, Sloan Saunders and Roger Saunders expressly and/or impliedly agreed and understood that all investment opportunities that came to or were secured by them in the high yield loan business must be fully disclosed to the other side, and that neither side could appropriate for themselves any opportunities or profits related to that business except upon, at minimum, full disclosure and mutual consent.

51.     The nature of the business in which the parties were engaged and the manner in which these parties engaged in that business – by which Outside Capital and Owner Capital were utilized in various different combinations on terms that differed from deal to deal – regularly created the potential for improper self-dealing, and thus tested the parties fidelity to their fiduciary duties of loyalty.

52.     In the various ways described below, the Saunders side did not honor its fiduciary obligations.

53.     Sloan Saunders and Roger Saunders expressly and/or impliedly represented to Briner, and induced Briner to believe, that they were agreeable to an arrangement by which, absent an agreement to the contrary on a particular deal, Owner Capital would earn a return on actual cash invested equal to the interest rate on the underlying loan, and would also be entitled to a proportionate share of the points (and/or any exit fee) upon full repayment. Accordingly, under this arrangement, with respect to Owner Capital, Revere Investments (i) would earn no Interest Rate Spread Profit, (ii) would retain all Interest-on-Points Profit, and (iii) upon full repayment of a loan, would share with Owner Capital Points Profit.

54.     The representations described in ¶ 53 above were made, among other ways, implicitly in part in the form of the investor payout spreadsheets prepared by Sloan Saunders, which showed payouts to what was indicated as Owner Capital – whether arranged by the Saunders side or the Briner side – in this manner.

55.     Briner did not object to treating Owner Capital in the manner described in ¶ 53 above, and reasonably believed that there was at least a tacit understanding to this effect, subject to the right of either side to withdraw such tacit consent and to propose a different arrangement for future deals.

56.     Briner continued to operate on the understanding described in ¶ 53 above until the late spring of 2011, when, as discussed more fully in ¶¶ 93-103 below, he learned that, contrary to what he had been led to believe, the Saunders side had almost from the beginning been raising

Outside Capital and investing it through Saunders Capital in order to disguise it as their Owner Capital so as to appropriate for themselves the Interest Rate Spread Profit and Points Profit that, under the tacit understanding described above, should have belonged to the partnership.

*Formation of Revere High Yield Debt Fund*

57.     In late 2010 – when Briner remained unaware of the Saunders side deceptions referred to in ¶ 56 above – Briner, Sloan Saunders and Roger Saunders decided to further expand the business of Revere Investments by creating a private equity fund.  That fund would raise Outside Capital through a private placement offering that would solicit investments of Outside Capital to be pooled in the fund, which would then make multiple diversified loan investments, as opposed to the prior practice by which investments were made on a deal-specific basis directly into individual loans through participation interests.

58.     In furtherance of the plan described in ¶ 57 above, a private placement memorandum (the "PPM") dated March 1, 2011 (a copy of which is attached as Exhibit B and incorporated here by reference) was prepared and furnished to prospective investors.  The PPM solicited investments in Revere High Yield Debt Fund, L.P. (the "Fund"), a Delaware limited partnership that was formed at or about that time.

59.     The PPM identified Clark Briner and Roger Saunders as the "principals" of the Fund.

60.     The PPM identified "Revere Capital" as the "sponsor" of the Fund.  This, by agreement of both sides of the partnership, was to afford the partnership, in relation to the Fund,

the benefit and use of the reputation, goodwill, trade name, trademarks, service marks and other intangible and intellectual property belonging to Revere Capital.

61.     On or about February 24, 2011, Roger Saunders and Clark Briner, as members, formed Revere High Yield GP, LLC ("Fund GP"), a Connecticut limited liability company. A principal purpose of Fund GP, as stated in Section 1.3 of its Operating Agreement, (a copy of which is attached as Exhibit C and incorporated here by reference), was to "serve as the general partner of Revere High Yield Debt Fund L.P." Section 5.1 of the Fund Limited Partnership Agreement provides in part as follows:

> Management of Partnership. The management, control, and direction of the Partnership and its operations, business, and affairs shall be vested exclusively in the General Partner. . .

62.     On or about February 24, 2011 Fund GP, as general partner of the Fund executed a Limited Partnership Agreement of Revere High Yield Debt Fund, L.P. (the "Fund LP Agreement"), a copy of which is attached as Exhibit D and incorporated here by reference.

63.     Briner and Roger Saunders at all times have been sole members of Fund GP. At all times each has owned 50 percent of its membership interests, and each have equal voting control. Briner and Roger Saunders have also, at all times, been the sole co-managers of Fund GP, having equal management control.

64.     It was agreed and understood, however, that Sloan Saunders would be actively involved in the affairs of the Fund and Fund GP, acting in concert with and as agent for Roger Saunders. Roger rather than Sloan Saunders was named as member and manager of Fund GP

only because Sloan Saunders did not wish his full-time employer, Ranieri Partners, to become

aware of his involvement.

65.     The effect of the agreements and understandings described in ¶¶ 58-64 above is

that Fund GP cannot take any actions or make any decisions over the objection of either Briner

or the Saunders.

66.     Section 5.2 of the Fund LP Agreement provides as follows:

> Exclusivity. The Partnership will participate in all of Revere Capital's and
> the Principals' real estate debt investments that are over $500,000 in
> principal loaned during the Investment Period.

The word "principals" is defined in Section 2.1 as follows:

> Principals shall mean Roger L. Saunders and Clark B. Briner and any
> other Person who is designated as a Principal by the General Partner for
> purposes of this Agreement. A Person shall cease to be a Principal for
> purposes of this Agreement at such time as the General Partner so
> designates.

67.     The PPM provided in part as follows:

> The General Partner may, in its sole discretion, "close" the Fund at any
> time by refusing to (i) allow the admission of new Limited Partners and/or
> (ii) accept additional capital contributions by existing Limited Partners
> without notice to the Limited Partners. Notwithstanding the foregoing, the
> General Partner may, at its sole discretion, reopen the Fund offering
> period as of any date.

68.     Section 2.1 of the Fund LP Agreement defines the term "Investment Period" as

follows:

> Investment Period shall mean the period beginning on the Initial Closing
> Date and ending on the earlier of (i) the date that the General Partner
> specifies at the end of the Investment Period in a written notice to the
> Limited Partners and (ii) the third anniversary of the Initial Closing Date;

provided, however, that the General Partner may, in its sole discretion, extend the Investment Period for an additional year.

69.     Section 3.1 the Fund LP Agreement provides as follows:

The determination of (i) whether and when to proceed with any Investments, (ii) the structure, terms, and conditions thereof (including the form of the acquisition vehicle, capital structure, and terms of financing), (iii) the type, amount, and timing of each Investment, (iv) the structure, terms, and conditions of any repurchase, repayment, sale, refinancing, retirement, or other disposition of any Investment, (v) the incurrence and payment of Partnership Costs, and (vi) all other matters incidental to any of the foregoing shall be made by the General Partner, in each case subject to the terms of this agreement.

70.     The intention of the parties to the PPM and the Fund LP Agreement, as manifested by the PPM and Fund LP Agreement provisions described in ¶¶ 67-69 above, was that the Fund could cease to make new investments at any time but no later than approximately four years after its formation.

71.     Pursuant to Sections 2.1, 5.1 and 5.3 of the Fund LP Agreement, Revere Investments was designated as the "Management Company" for the Fund, subject to the right of Fund GP to replace it.

*Overview of Fund Operations From Formation to Date*

72.     The Fund obtained commitments for approximately $18 million of capital in total, 75% of which – approximately $13.5 million – was called.  Approximately 95% of this capital was raised by Briner.

73.     The Fund invested in participation interests in approximately twenty-two loans. Most such loans were made in the name of Revere Investments as agent for the Fund and, in

many cases, as agent for other loan participants. These investments were sourced approximately equally by Briner and Roger Saunders.

74.    In August 2012, on the advice of Fund counsel – for the reasons particularly described in ¶¶ 134-138 below – the Fund stopped raising new capital and making investments.

75.    As of this date the Fund is in the process of winding down.

76.    As of this date two loans in which the Fund participated remain to be paid or resolved. One pre-Fund Revere Investments loan also remains to be resolved.

77.    As of this date all investor capital has been returned together with a return on capital exceeding 9% per annum. Further distributions are expected which will increase this return.

*How the Parties Expected to Make Money in Connection with the Fund*

78.    Revere Investments and its partners hoped to earn income in connection with the Fund in several ways. These included a management fee that, pursuant to § 5.3 of the Fund LP Agreement, was and remains payable monthly to Revere Investments in its capacity as the "Management Company" designated in the Fund LP Agreement in an amount equal to 1.5% per annum of committed capital.

79.    Section 8.1 of the Fund LP Agreement provided for a method of allocating proceeds to partners under which, substantially, Fund investors would first be entitled to a fixed 8% per annum rate of return on cash invested plus a return of cash invested before any amounts would be payable to Fund GP. After Fund investors received this amount, if at all, any further proceeds would be allocated between the limited partners and Fund GP in a manner specified in

the Fund LP Agreement.  Such potential profit allocated to Fund GP is what is often referred to –

and will be referred to here – as a "promote."  The "promote" constituted an additional source of

contemplated profit to the Briner and Saunders sides of the partnership.

80.     There were other potential sources of profit associated with loans in which the

Fund invested including, especially, profit sources related to what are referred to in ¶¶ 81-82

below as "side car" investments.

*The Saunders Use "Side-cars" (and Other Devices) to Usurp Profit Opportunities from
Revere Investments and the Fund*

81.     Many of the loans in which the Fund invested involved what are sometimes

known as "co-investments" or "side-cars."  Those terms are sometimes understood to refer to a

direct investment in an asset, alongside an investment fund that invests pooled capital into

multiple assets, by an investor who, often, is also an investor in the investment fund.  The term

"side-car" will be used here in that sense.

82.     Side-cars were used in connection with Fund investments to invest both Owner

Capital and Outside Capital.

83.     As described more fully below, the Saunders side used side-cars in ways that

constituted improper self-dealing in violation of its duty of loyalty and non-competition.

1.     Briner  Shares Side-Car Profit from Outside Capital on the Understanding that the
Saunders are Doing the Same – But He Eventually Learns He has been Misled.

84.     Until December 2011, all Outside Capital raised by Briner that was invested in

side-cars was invested through Revere Investments, so that both sides of the partnership shared

equally in Interest Rate Spread Profit, Interest-on-Points Profit and Points Profit generated by those side-cars.

85.     The Saunders side did not always arrange side-car investments of Outside Capital through Revere Investments.

86.     In at least two instances -- one involving the Fund and one pre-dating it -- the Saunders disguised Outside Capital as Owner Capital, as more fully described in ¶¶ 93-108 and 115-132 below, in order to appropriate for themselves all of the Interest Rate Spread Profit and Points Profit generated by such investments in contravention of the understanding described in ¶ 53 above.

87.     Moreover, in the loans referred to by the parties as "72nd Street," "Charleston, South Carolina" and "Pawtucket," Peter Joseph -- a long-standing and close business associate of Roger Saunders -- was allowed to invest in side-cars in the name of his company, PMJ Capital, on terms that generated no profit of any kind for the Fund or for the partnership. However, on information and belief, the Saunders side profited from these transactions with Peter Joseph in the form of various past and future transactions that Peter Joseph brought Roger Saunders into on a similar "non-profit" terms.

2.     The Saunders Use Side-Cars to Take for Themselves the Lion's Share of the Best Deals

88.     Briner used side-cars, following disclosure to and consent by the Saunders, where necessary and prudent to facilitate the raising of capital for the Fund and to most effectively deploy Fund capital.

89.     The Saunders, however, used side-cars without regard to the best interests of the Fund.

90.     Continuing a pattern of conduct that had begun before the Fund was formed, in deals that Roger Saunders sourced, Roger Saunders would often dictate on a "take it or leave it" basis the portion of the deal that he would make available to the Fund, even where the Fund then had available un-deployed capital, thus effectively appropriating for himself and family members a rate of return equal to the rate of return on the underlying investment for whatever portion of an investment he wished. On deals that Roger Saunders regarded as the most profitable and/or least risky, he took the majority of the deal, and left the Fund with relatively small pieces.

91.     Briner objected to the Saunders' conduct as described in ¶ 90 above, but Roger Saunders made clear that if Briner did not accept the terms dictated by Roger Saunders, then the Saunders would treat the Fund as having turned the investment down. Briner was thus forced to acquiesce in order to prevent even greater harm to the Fund.

92.     The Saunders side engaged in the self-dealing and disloyal conduct as described in ¶¶ 89-91 above in, without limitation, the following instances (identified by the name generally used by the parties to describe the loan):

(i) *Ft. Lauderdale:* The Saunders side took by fiat $2.6 million of a $3.4 million pre-Fund investment, depriving the partnership of profits of approximately $507,000;

(ii) *Long Island City:* The Saunders side (including Outside Capital, the profit from which Saunders did not share with the partnership) took by fiat $2 million of a $3.4

million investment, depriving the Fund of profits of approximately $250,000, while also depriving Fund GP of associated "promote" profit;

(iii) *Kings Point:* The Saunders side (after first trying, albeit unsuccessfully, to conceal the entire transaction from the Briner side so as to appropriate all the profit) took by fiat $400,000 of a $500,000 investment, depriving the Fund of profits of approximately $115,000, while also depriving the partnership of associated "promote" profit;

(iv) *72nd Street:* The Saunders side (including, investment by Saunders' business associate Peter Joseph whose named on terms generating no profit for the partnership) took by fiat $2.1 million of a $3.4 million investment, depriving the Fund of profits of approximately $625,000, while also depriving the partnership of associated "promote" profit.

*Briner Discovers that the Saunders Side had Concealed that Investments Represented as Owner Capital Were in Fact Outside Capital Investments.*

93.     Before June 2011 all information disclosed by the Saunders concerning the source of funds raised by the Saunders identified the participating investors either as "Saunders Capital" or, in one case, "Sloan Saunders." All accounting spreadsheets, reports and registers, until June 2011, identified all Saunders side investors in this manner. In no case before June 2011 did Roger Saunders or Sloan Saunders affirmatively disclose that there were *any* Outside Investors brought into any deal by the Saunders side.

94.     The second loan made by Revere Investments, made in June 2010, was known by the parties as the "Danbury" loan.  In connection with the Danbury loan the Saunders raised capital which Sloan Saunders, with the knowledge of Roger Saunders, represented in the manner described in ¶ 93 above to be Owner Capital.

95.     The representation described in ¶¶ 93-94 was false and was known by both Sloan Saunders and Roger Saunders to be false when made.

96.     All or a portion of the Danbury participation investment disclosed by the Saunders as an investment by "Saunders Capital" was in fact Outside Capital invested by at least three individual investors brought in by Roger Saunders who were not his family members.

97.     Sloan Saunders made the representation described in ¶¶ 93-94 above to – with the knowledge and assistance of Roger Saunders – induce Briner to acquiesce in the arrangement described in ¶¶ 53-56 above by which Revere Investments would earn no Interest Rate Spread Profit or Points Profit with respect to Owner Capital invested by the Saunders, and to induce him to share equally with the Saunders side Interest Rate Spread Profit and Points Profit earned with respect to Outside Capital that Briner had raised and expected to raise in the future.

98.     Briner learned that Outside Capital investments in the Danbury loan had been disguised as Saunders side Owner Capital in the late spring of 2011 – about a year after the loan had been made – as the result of Sloan Saunders neglecting to send one of those Outside Capital investors – a David Feuereson ("Feuereson") – his quarterly distribution check.  This caused Feuereson to call the Revere Investments office, and to be put through to Briner.  Feuereson explained why he was calling.  Briner did not then know Feuereson was an investor in any

Revere Investments deal, and asked Feuereson to supply documentation. Feuereson then sent Briner a copy of a Participation Agreement between him and Revere Investments that purported to be signed by Briner in addition to Sloan Saunders. A copy of that document is attached as Exhibit E.

99.     Briner's signature on the purported Participation Agreement referred to in ¶ 98 above was a forgery.

100.     On information and belief, Sloan Saunders was the forger of such signature or was complicit in such forgery.

101.     Feuereson later informed Briner that Sloan Saunders had originally furnished him with a Participation Agreement that only Sloan Saunders had signed but that Feuereson – an attorney who, on information and belief, checked with the Connecticut Secretary of the State and saw that Briner's name is listed as a manager – insisted on a document signed by Briner.

102.     Briner's signature was forged in an attempt to conceal the fact that investments represented to be investments of Saunders side "Owner Capital" included Outside Capital so that the Saunders could appropriate the Interest Rate Spread Profit associated with the Outside Capital Investments that it arranged while obtaining the benefit – which it could not have obtained without such misrepresentation – of half of all the profits earned with respect to the substantially greater amount of Outside Capital raised by Briner.

103.     On information and belief in connection with loans other than the Danbury Loan, Sloan and Roger Saunders have knowingly misrepresented Outside Capital as their Owner Capital for the purposes described in ¶ 97 above.

*The Saunders Self-dealing Coupled with the Discovery of the Danbury Fraud Accelerates the Deterioration of the Relationship Between the Partners – June 2011 to December 2011*

104.   Following Briner's discovery of the Saunders' misrepresentation concerning the source of capital for the Danbury loans as described above, and the Saunders' continued unfulfilled promises to contribute more time and effort, the relationship continued to deteriorate, to the point that, in December 2011, Briner attempted to invoke a "buy/sell" provision in the Revere Investments Operating Agreement.   The attempt was successfully blocked by the Saunders side, in part through the use of threats by Roger Saunders to use the litigation process to harm Briner and, as Roger Saunders put it, "ruin" his reputation.

105.   In December 2011 Briner notified the Saunders side that, due to the continued refusal of the Saunders side to devote remotely equal time and effort, coupled with his discovery of the Danbury loan fraud and forgery as described above and the pattern of disloyal and self-dealing conduct that it was meant to cover up, he was no longer willing, in connection with future loans, to share equally with the Saunders side, side-car profit generated on deals he sourced with Outside Capital he raised.

106.   In and after December 2011, the Fund made twelve further loan investments.   In three of those loans it was necessary to place Outside Capital raised by Briner in side-cars in order to facilitate deployment of Fund capital.   These loans were known by the parties as the "Uptown Ally," "Houston Land," and "Charleston, South Carolina" loans.

107.   In accordance with the notice he had given in December 2011 as described in ¶ 105 above, Briner informed the Saunders before the closings of each of the Uptown Ally,

Houston Land, and Charleston, South Carolina loans that he intended to arrange side-car participations through Revere Capital rather than Revere Investments. Both Roger Saunders and Sloan Saunders knew this is how the loans would be closed. They did not communicate any objection, but cooperated in the closings.

108.    By their conduct as described in ¶ 107 above, the Saunders side tacitly agreed to the arrangement described in ¶ 105 above by which Briner put the Saunders side on notice that it should not expect to profit from side cars arranged by Briner or deals he sourced.

*Sloan Saunders Transfers his Membership Interest in Revere Investments to Roger Saunders*

109.    On February 12, 2012, Sloan Saunders assigned his fifty percent membership interest in Revere Investments to Roger Saunders.

110.    Sloan Saunders, however, remained, and still remains, co-manager of Revere Investments.

*The Saunders Side Secretly Makes Loans in Competition with Revere Investments and the Fund – and in the Process Misappropriates Revere Capital's Intellectual Property and Goodwill*

111.    Beginning no later than early 2011 – and on information and belief earlier – the Saunders side began to surreptitiously compete with Revere Investments and the Fund, by making high yield loans through other vehicles, in violation of the non-competition provisions in the Revere Investments Operating Agreement described in ¶ 23 above, in violation of the provisions of the Fund LP Agreement described in ¶ 66 above, and in violation of their duty of loyalty to Briner, Revere Capital, Fund GP, the Fund and Fund investors.

112.    The loans referred to in ¶ 111 above were made by, through and with the assistance of Saunders Capital, which is owned and controlled, on information and belief, by Roger Saunders, and, by, through and with the assistance of Cedar Hill Holdings, which, on information and belief, is owned and controlled by both Roger Saunders and Sloan Saunders.

113.    In setting up operations of Cedar Hill, Roger Saunders, Sloan Saunders and Cedar Hill used, without permission of Revere Capital intellectual property, including its templates, process documents, systems and the like.

114.    In conducting operations on behalf of Cedar Hill, Sloan Saunders held himself out as an employee or agent of Revere Capital, and used emails containing Revere Capital's trade name, trademarks and service marks, so as to appropriate for his own benefit, and for the benefit of Roger Saunders, such property belonging to Revere Capital.

*The Saunders Take Their Self-Dealing to a New Level in the "Long Island City Loan"*

115.    The Fund's last three investments were closed June and July 2012. One, known by the parties as the "Long Island City" loan, closed in June 2012. That loan was sourced by Roger and/or Sloan Saunders.

116.    In connection with the Long Island City loan Roger Saunders and Sloan Saunders insisted on appropriating for themselves a "wrap" opportunity that involved a greater return with less risk than the portion of the deal that they were willing to let the Fund take. A "wrap" is sometimes understood to mean an arrangement in connection with a new second mortgage loan in which the second mortgage lender assumes the payment of the first mortgage and collects a combined first and second mortgage payment from the borrower. (The term "wrap" is used in

that sense here.) In such a "wrap" transaction there typically is a profit spread between the interest rate payable by the borrower to the new lender on account of the wrap mortgage and the interest rate owed to the first mortgagee, generating a return that typically is greater than the return on the second mortgage itself with less risk – because the "wrap" is secured by a first rather than second position lien on the real estate. The "wrap" that the Saunders proposed to take for themselves in connection with the Long Island City loan was structured in this way.

117.    After learning of the Saunders' "wrap" plan as described in ¶ 116 above, Briner confronted the Saunders with the obvious violations of fiduciary duty represented by that arrangement, and notified them that Briner would not consent to the Fund investing in the deal if the benefit of the "wrap" feature were to be appropriated solely for the Saunders' benefit. Since the Fund investment was needed to close the loan, and since it was (correctly) perceived by the Saunders as an especially lucrative deal, the Saunders were thus forced to abandon their "wrap" scheme.

118. The Saunders, however, failed to make a full and honest disclosure of other material facts concerning the Long Island City loan, as described in ¶¶ 119-132 below.

119.    The total principal amount of the Long Island City loan was $3.4 million. The Saunders proposed to keep $1.4 million for themselves, and to allow the Fund to take $2 million. Since the Fund then only had the capacity to take about $1.4 million, but both sides expected to receive within two to three weeks sufficient additional capital to take the remaining $600,000, the Saunders agreed to provide short-term bridge funding for that amount on the understanding that the Fund would be permitted to replace it as soon as it was able.

120.    Also, unbeknownst to Briner, about $800,000 to $900,000 of the funds used by the Saunders to invest in the Long Island City loan was Outside Capital that had been raised by one Evan Woolley ("Woolley").

121.    Woolley is a friend of Sloan Saunders who at the time the Long Island City loan was being arranged was an independent contractor engaged by Revere Capital pursuant to an "Executive Agreement." A copy of that agreement is attached as Exhibit F and incorporated here by reference.

122.    Section 7 of the agreement referred to in ¶ 121 above provides in relevant part as follows:

> [T]he Executive [Woolley] shall serve Revere EXCLUSIVELY and shall not solicit sales of any securities for itself or any third parties during the Term; *provided, however*, that the Executive may pursue other activities, both for profit and not for profit, if the Executive was engaged in such services prior to the date hereof, and such activities were disclosed in writing to Revere prior to the date hereof and approved. In the event the Executive, during the term of this Agreement, desires to participate in other activities, either for profit, or not for profit, it shall first give notice of the same to Revere. Furthermore, the Executive warrants, represents and covenants that all information provided on the solicitation of sales, or on any potential and/or actual investors shall be completely true and accurate. The Executive shall not offer securities or other financial products other than in connection with this Agreement without the prior, written approval of Revere, which approval may be withheld in Revere's sole and absolute discretion.

123. Had Woolley and the Saunders informed Briner of the Outside Capital raised by Woolley, the Saunders and Woolley knew that Briner would have insisted, in accordance with the exclusivity provision of Woolley's contract as described in ¶ 122 above and the understanding and course of dealing between the parties, that such investment be made through

Revere Investments so that Points Profit and Interest Rate Spread Profit would be shared equally between the parties.

124.    Woolley's conduct as described in ¶ 120 above constituted a breach of the exclusivity provision of his contract quoted in ¶ 122 above, encouraged, induced and assisted by the Saunders, who knew at that time that Woolley was obligated to raise capital exclusively for the Fund and Revere Investments.

125.    The capital raised by Woolley was invested through Cedar Hill and was treated by the Saunders as if it was all Owner Capital in accordance with the understanding and course of conduct of the parties, i.e., it was reflected in the books and records of Revere Investments as (i) earning interest at the same rate as the underlying loan and (ii) as participating in points.

126.    By their silence, Woolley, Roger Saunders and Sloan Saunders implicitly represented to Briner that the Saunders side investment was all Owner Capital and that no portion of it had been raised by Woolley.

127. The representations described in ¶ 126 above were false, were known to be false when made, and were made for the purpose of inducing Briner to agree to the arrangement proposed by the Saunders and to accept, on behalf of Revere Investments and on his own behalf, no Interest Rate Spread Profit and no Points Profit with regard to the capital raised by Woolley, so that the Saunders side could appropriate all such profit notwithstanding that that capital was raised from an outside source by a person who had been engaged on an exclusive basis to raise Outside Capital for the Fund and Revere Investments.

128.    Moreover, in material violation of their fiduciary duty and the agreement between the parties, as well as the terms of the Fund LP Agreement, the Saunders side – which, having sourced the loan, controlled the closing process – caused the loan to be made, using Fund money in part, in the name of Cedar Hill as the lender on the loan documents. The Saunders side did not disclose to Briner their plan to make the loan in the name of Cedar Hill. Briner learned of it the business day before the scheduled closing only as a result of a telephone call with the closing attorney. Briner objected to this plan, but Roger and Sloan Saunders represented that it was too late to change the loan documents, while agreeing to assign or re-state the loan documents in the name of Revere Investments post-closing. In reliance on this representation, Briner consented to the closing. But after the loan closed the Saunders refused to assign or re-state the loan documents in the name of Revere Investments as agreed.

129.    The Saunders repudiated their agreement as described in ¶ 128 above because keeping the loan in the name of Cedar Hill allowed them to service the loan through Cedar Hill, which in turn allowed them to conceal from Briner the fact that it was financed in part by a side-car investment that included Outside Capital raised by Woolley. This was for the purpose of facilitating through such deception the Saunders' scheme to appropriate for themselves the profit associated with that Outside Capital.

130.    As alleged in ¶ 119 above, Roger Saunders and Sloan Saunders had represented to Briner that the $600,000 referred to in ¶ 119 above would only be a short term "bridge" loan, and that the Fund would be permitted to take it out as soon as it was able, which was anticipated – correctly as it turned out –to be within two to three weeks.

131.    Briner acquiesced in the closing of the Long Island City loan partly in reliance on the representation described in ¶ 119 above, which Roger and Sloan Saunders made to induce such reliance. Such representation, however, was false, and was false when made, in that Roger Saunders never had any intention to permit – nor did he in fact permit – the Fund to replace and payoff the $600,000 funded by the Saunders, notwithstanding that the Fund was able to do so shortly after the closing and despite numerous demands by Briner.

132.    As a result of the Saunders' refusal to allow the Fund to replace their $600,000 bridge loan, the Fund was deprived of profits of approximately $85,000 and Fund GP was deprived of associated "promote" profit.

*Roger Saunders Becomes Enraged when Briner Partially Blocks His Plan to Benefit Himself at the Expense of the Fund and the Partnership, and Threatens to "Destroy" Briner*

133.    Roger Saunders was enraged by Briner's partial thwarting of his plan to skim the cream from the Long Island City loan for his own benefit, as described in ¶¶ 115-132 above. Beginning at that time Roger Saunders made a series of threats to "destroy" Briner by harming his reputation and business. As described below, Roger Saunders, with assistance from Sloan Saunders, thereafter took and continues to take steps for the exclusive or primary purpose of carrying out these threats.

*Due to the Irreconcilable Issues within the Briner/Saunders Partnership, the Fund Stops Raising New Capital and Making New Loans – August 2012*

134.    From the date of its formation until the late summer of 2012, the Fund had been represented by the law firm of Wick, Phillips, Gould & Martin ("Wick Phillips").

135.   In August 2012, Wick Phillips rendered to the Fund, Briner, Roger Saunders and Sloan Saunders an opinion that, in view of the deterioration of the relationship between the two sides of the partnership, no new capital should be raised from Fund investors without disclosure of the nature of the relationship to investors.

136.   After receipt of the opinion of Wick Phillips as described in ¶ 135 above, the Saunders side withdrew its consent to the continued retention of Wick Phillips, forcing it to terminate its representation of the Fund.

137.   Thereafter, by agreement of the parties mediated by counsel, the firm of Levitt Rockwood PC was retained as independent Fund counsel to represent the interests of the Fund investors.

138.   Levitt Rockwood then rendered advice similar to that of Wick Phillips, except that Levitt Rockwood opined that in view of the deterioration of the relationship between the partners the Fund should not, under the circumstances, raise new capital or invest in new loans at all.

139.   After Levitt Rockwood rendered the advice described in ¶ 138 above, the Saunders side withdrew its consent to the continued retention of Levitt Rockwood – on the pretext of a conflict of interest – forcing Levitt Rockwood to terminate its representation of the Fund.

140.   At all times Roger Saunders and Sloan Saunders continued to insist that, notwithstanding the management deadlocks, irreconcilable differences and disagreements and

deterioration of relations between the two sides of the partnership, the Fund should continue to raise Outside Capital without disclosing the nature of such relationship to investors.

141.    The assertions described in ¶ 140 above are without probable cause, and are made for the exclusive or primary purpose of harming Briner's reputation with investors with whom Briner has continuing relationships.

*After the Fund is Closed and this Litigation is Commenced, Briner Forms the Hedge Fund*

142.    The closure of the Fund and cessation of new investments as of August 2012 rendered moot the parties' obligation of non-competition.

143.    In January 2013 Briner issued a private placement memorandum soliciting investors for the Hedge Fund. On or about February 1, 2013 the Hedge Fund commenced operations.

144.    The Hedge Fund is of indefinite duration and the type of investments it may make is not limited to investments in high yield real estate loans.

145.    RCM acts as an "Investment Manager" for the Hedge Fund. As such it is entitled to receive a management fee which is based on the amount of capital raised.

146.    Revere GP is the general partner of the Hedge Fund. As such it expects to receive a "promote" similar to that described in ¶ 79 above with respect to the Fund.

*The Saunders Attempt to Carry Out Their Threats to "Destroy" Briner – By*
*Interference with his Investors through their Tax Returns*

147.    Following his threat to "destroy" Briner, Roger Saunders and Sloan Saunders, acting in concert and with the material, knowing assistance of each other, and others, have taken

46

a number of concrete steps to attempt to carry out that threat, all done with malice, as described below. Many of these acts are directed at impairing Briner's good reputation with the investors with whom he has continuing relationships.

148.    A tactic adopted by Roger and Sloan Saunders in their effort to harm Briner was and is to prevent the Fund from issuing 2012 IRS Form "K-1" statements to the investors in order to create income tax problems for the investors.

149.    A "K-1" is an income tax form that an entity taxed as a partnership – such as the Fund – must issue each year to partners stating the amount of taxable income or loss allocated to each partner. Partners require this information for use in filing their respective income tax returns.

150.    In March 2013, Roger Saunders and Sloan Saunders adopted, for the first time, the position that taxable income attributable to points should be recognized for income tax purposes on the date that loans closed and/or should be amortized over the term of loans, rather than – as had been the practice since the inception of the Fund and Revere Investments – when a loan was fully paid off, if at all, and the points were actually collected from the borrower.

151.    From the inception of the Fund until January 2013, the tax and audit accountants for the Fund were Fred Bastie and Associates ("Bastie").

152.    As Roger Saunders and Sloan Saunders were aware, Bastie's opinion was that points should not be recognized until they are actually paid – if paid at all – at the time of loan payoff.

153.    The Fund's tax returns for 2011 were prepared on the basis described in ¶¶ 150-152 with no objection from the Saunders side.

154.    However, in January 2013, Roger Saunders and Sloan Saunders suddenly withdrew consent – by sending a "cease and desist" letter coupled with a threat to sue Bastie if it did not immediately comply – to the continued retention of Bastie, requiring Bastie to withdraw as the Fund's accountant.

155.    On or about February 15, 2013, by agreement of the parties mediated by counsel, the parties agreed to retain WTAS, LLC ("WTAS") as Fund accountant.

156.    WTAS prepared the Fund's tax returns for 2012 in accordance with its opinion as to the proper way to account for points, which coincided with the Fund's past practice.

157.    WTAS was dismissed by counsel in a March 6, 2013 letter from the Saunders' counsel.

158.    On or about March 19, 2013, by agreement of the parties mediated by counsel, the parties agreed to retain Pugliese, Moore and Co., LLP ("Pugliese") as Fund accountant.

159.    Pugliese, who lacked the experience in Fund accounting of both Bastie and WTAS, questioned when points should be recognized.

160.    However, after receiving additional input from Briner's accounting firm, Cohn Reznick, Pugliese agreed to prepare the 2012 tax returns and K-1's based upon the prior methodology. But due to the mutual mistrust between the parties, Pugliese refused to finalize the tax returns and K-1's without the parties' mutual agreement that all deals in which points were charged were "net funded" – meaning that the borrower did not pay the points at closing but

rather paid them (if at all) upon final loan payoff.  Although this is a fact not subject to reasonable dispute, the Saunders side has to date refused to communicate to Pugliese its agreement with this fact.

161.    The Saunders seized upon this issue, in an effort to block the finalization of investor K-1's by April 15 – in which they were successful – so as to harm the investors and thus harm Briner's reputation among them.

162.    As of this date the Saunders still refuse to cooperate reasonably so that tax returns may be finalized and K-1's issued by the extension deadline of October 15, 2013.

163.    All of the conduct by Roger Saunders and Sloan Saunders alleged in ¶¶ 147-162 above is malicious and for the purpose of harming Briner's reputation with investors with whom he has relationships.

*The Saunders Attempt to Carry Out their Threats to "Destroy"*
*Briner – Through This Litigation*

164.    This litigation was not brought in good faith but was brought without probable cause and for a purpose other than that which the litigation process is designed, i.e., to carry out Roger Saunders' explicit threats to "destroy" Briner. Some of the specific ways in which the Saunders have attempted, and continue to attempt, to accomplish this goal are described below.

165.    All versions of the Complaint in this matter have been replete with words such as "larceny," "theft," "fraud," etc., notwithstanding the absence of probable cause for such claims.

166.    Some of Roger Saunders claims in this litigation relate to the manner in which income in respect of points was allocated to investors.  Roger Saunders claims in this action that Briner committed "fraud" in this regard.

167.    Roger Saunders and Sloan Saunders have asserted the claim described in ¶ 166 above, and have used in pleadings in the public record the words "fraud" and "deceit" in connection with that claim, despite knowing:

(a)  that the accounting methodology at issue had been reviewed by and at least implicitly approved by the Fund's auditor;

(b)  that the accounting templates that determined the manner in which income with respect to points was allocated to Fund investors were created by Sloan Saunders;

(c)  that before the commencement of this action, and by agreement of the parties, the accounting methodology at issue was changed retroactive to the start of the Fund, and a corresponding transfer of funds as between Revere Investments and the Fund was effected, using the methodology that the Saunders now claim in this litigation they favor; and

(d)  that, as of the date of the changes in accounting methodology mentioned in sub ¶ (c) above, no investor distributions that had been made to that point had been affected by the accounting methodology at issue.

168.    The claim described in ¶ 166 above is and continues to be asserted by the Saunders side without probable cause, and for the primary or exclusive purpose of interfering

with Briner's relationship with investors with whom he has continuing relationships as well as interfering with Briner's ability to secure new investors.

169.   Roger Saunders has applied for a prejudgment remedy (the "PJR Application") against the Hedge Fund for the amount of at least $6 million, notwithstanding that:

(a) there is no probable cause for a belief  Briner or Revere Capital assumed any obligation to the Saunders side to continue to raise capital or to deploy the Fund's committed capital for the entire maximum period that the Fund could remain open, especially in view of the expressly contrary provisions of the PPM and the Fund LP Agreement as described in ¶¶ 67-70 above;

(b) as Roger Saunders admits in ¶¶ 53 and 54 of his Amended Verified Complaint dated April 17, 2013, "there is a deadlock in management in both Revere Investments and Revere GP, LLC that cannot be broken";

(c) as described in ¶¶ 134-139 above, two successive Fund counsel have, in substance advised the Fund that it should not continue to make new investments due to the management deadlock; and

(d) there is no probable cause for a damage claim in an amount remotely approaching $6 million or more against the Hedge Fund.

170.   The mere filing of the PJR Application harms the Hedge Fund and Briner.

171.   At all relevant times Roger Saunders has been aware that the mere filing of the PJR Application would harm the Hedge Fund and Briner.

172.     The exclusive or primary purpose of the PJR Application, insofar as it concerns the Hedge Fund, is to harm Briner.

173.     Madison Mott, Inc. – owned by Briner's spouse – was named a defendant in this action without probable cause to support any claim of wrongdoing by it, but for the purpose of harming Briner by forcing his spouse to incur substantial attorney's fees and to cause her distress.

174.     The pendency of the action itself and the manner in which it has been prosecuted was and is intended to cause – and has caused – Briner harm by forcing him to incur substantial attorney's fees, by harming his relations with existing investors and with other third parties such as employees and independent contractors, and by impairing his ability to secure new investors.

*Profits are Impounded*

175.     In or about November 2012, a loan made by Revere Investments referred to by the parties as the "Charleston, South Carolina" loan was paid off. Attorney Michael Goldman was engaged by Revere Investments in respect to such payoff. Upon demand by Roger and/or Sloan Saunders, he retained and still holds approximately $90,000 of the proceeds of this loan.

176.     The funds held by Goldman referred to in ¶ 175 above represented the entire profit earned by Revere Capital with respect to the Charleston, South Carolina loan.

177.     Roger and/or Sloan Saunders instructed Goldman to impound the funds referred to in ¶¶ 175-176 above notwithstanding that the Saunders side's stated claim to those funds was for only half the impounded amount, or about $45,000.

178.   Briner objected to the impounding of funds not in dispute and proposed that all Saunders-side profit then should be impounded as well.  Roger and/or Sloan Saunders responded that if Briner insisted on impounding any part of their profit, they would instruct Goldman to impound outside investors' funds.  That forced Briner to acquiesce in order to prevent Fund investors from being harmed.

179.   By stipulation of the parties in this matter, on December 17, 2012, the Superior Court appointed a certified public accountant, Alan Schachter ("Schachter"), as "fiduciary" for Revere Investments, with powers specified in a stipulated order entered by the court.  Those powers included assuming control of Revere Investments' and the Fund's bank accounts and making payments to outside investors, while impounding – pending resolution of the disputes between the parties – all "fees and profits of any type" to either side of the partnership.  (The "fees and profits" impounded by Schachter as described above, together with the "fees and profits" impounded by Goldman as described in ¶¶ 175-176 above, will be referred to here as the "Impounded Funds.")

*The Saunders Misuse the Services of the Court-Appointed Fiduciary*

180.   The Saunders side has, without any notice to the Briner side, caused Schachter to spend substantial time investigating claims that Sloan and Roger Saunders know or should know are baseless.

181.   Schachter has charged Revere Investments – and has been paid by it – substantial amounts to investigate the baseless claims referred to in ¶ 180 above.

## CAUSES OF ACTION

## COUNT ONE

**(Breach of Fiduciary Duty:  Briner and Revere Capital v. Roger Saunders and Sloan Saunders)**

182.    Paragraphs 1 through 181 are incorporated herein by reference.

183.    In his capacity as one of two managers of Revere Investments having co-equal management powers, Sloan Saunders has at all times from the formation of the Fund possessed management control with respect to Revere Investments insofar as Revere Investments cannot act over his objection.

184.    As such co-manager of Revere Investments, Sloan Saunders owes Revere Investments and its members a fiduciary duty of loyalty and good faith with respect to the affairs of Revere Investments including an obligation to act in the best interests of Revere Investments and its members.

185.    As one of two equal co-managers of Fund GP Roger Saunders has at all times from the formation of Fund GP possessed management control over the affairs of Fund GP and the Fund insofar as neither Fund GP nor the Fund can act over his objection.

186.    As such co-manager of Fund GP, Roger Saunders owes to Fund GP and its members a fiduciary duty of loyalty and good faith with respect to the affairs of Fund GP and the Fund including an obligation to act in the best interests of Fund GP, the members of Fund GP, the Fund and the partners of the Fund.

187.    By virtue of the arrangements and understandings alleged above between Briner and Revere Capital on the one hand, and Roger Saunders and Sloan Saunders, on the other, those parties assumed, as to Revere Investments, Fund GP, the Fund and each other, fiduciary duties of loyalty and good faith with respect to the affairs of Revere Investments, Fund GP and the Fund, including an obligation to act in the best interests of Revere Investments, Fund GP, the Fund and each other.

188.    In the ways alleged above, Roger Saunders and Sloan Saunders have breached their fiduciary duties to Briner and Revere Capital.

189.    In the ways alleged above Roger Saunders and Sloan Saunders have advanced their own interests, with respect to the affairs of Revere Investments and Fund GP, to the detriment of Briner and Revere Capital.

190.    As a result of such breach of fiduciary duty, Briner and Revere Capital have been damaged in that they have been deprived of Interest Spread Profit Rate and Interest-on-Points-Profit and/or Points Profit, promote income, profitable investment opportunities, fees pursuant to § 5.8 of the Revere Investments Operating Agreement and/or management fees pursuant to § 5.3 of the Fund LP Agreement and/or they have been forced to absorb unwarranted professional fees and legal fees and/or have not been reimbursed for proper expenses.

## COUNT TWO

### (Derivative Claim by Revere Capital on behalf of Revere Investments for Breach of Fiduciary Duty v. Roger Saunders and Sloan Saunders)

191.    Paragraphs 1 through 181 are incorporated herein by reference.

192.     Paragraphs 183 through 189 of Count One are incorporated herein by reference.

193.     This is a claim by way of a member's derivative action brought pursuant to Fed.
R. Civ. P. 23.1.

194.     At all relevant times, Revere Capital was a member of Revere Investments
owning fifty percent of its membership interests.

195.     This claim is not a collusive one to confer on courts of the United States
jurisdiction that it would not otherwise have.

196.     Formal demand by Revere Capital upon Revere Investments to take action
adverse to Roger and Sloan Saunders would be futile due to Sloan Saunders' veto power, and
Revere Capital will fairly and adequately represent the interest of all owners of Revere
Investments in enforcing the rights of Revere Investments.

197.     In the ways alleged above, Roger Saunders and Sloan Saunders breached their
fiduciary duties owed to Revere Investments and advanced their own interests to the detriment of
Revere Investments and its members including Revere Capital.

198.     As a result of such breaches of fiduciary duty, Revere Investments has been
damaged, in that it has been deprived of Interest Rate Spread Profit, Interest-on-Points Profit
and/or Points Profit, promote income and/or fees pursuant to § 5.3 of the Fund LP Agreement,
and/or it has incurred and/or been forced to absorb unwarranted professional fees and has not
been reimbursed for proper expenses.

**COUNT THREE**

**(Derivative Claim for Breach of Fiduciary Duty by Briner and the Fund GP on behalf of The Fund for Breach of Fiduciary Duty v. Roger Saunders and Sloan Saunders)**

199.   Paragraphs 1 through 181 are incorporated herein by reference.

200.   Paragraphs 183 through 189 of Count One are incorporated herein by reference.

201.   This is a derivative action brought pursuant to Fed. R. Civ. P. 23.1 by Briner as a member of Fund GP and by Fund GP as general partner of the Fund, on behalf of the Fund.

202.   At all relevant times, Briner was a member of Fund GP owning fifty percent of its membership interests.

203.   At all relevant times Fund GP possessed all management control with respect to the affairs of the Fund.

204.   This claim is not a collusive one to confer on courts of the United States jurisdiction that it would not otherwise have.

205.   Formal demand by Briner upon Fund GP to take action adverse to Roger Saunders would have been futile due to Roger Saunders' veto power, and Briner and Fund GP will fairly and adequately represent the interest of all owners in the Fund enforcing the rights of the Fund.

206.   As a result of the conduct alleged above, the Fund has been damaged in that it has been deprived of profitable investment opportunities and has incurred and/or been forced to absorb unwarranted professional fees.

## COUNT FOUR

### (Derivative Claim for Breach of Fiduciary Duty by Briner on behalf of Fund GP for Breach of Fiduciary Duty v. Roger Saunders)

207.    Paragraphs 1 through 181 are incorporated herein by reference.

208.    Paragraphs 183 through 189 of Count One are incorporated herein by reference.

209.    This is a claim by way of a member's derivative action brought pursuant to Fed.
R. Civ. P. 23.1.

210.    At all relevant times, Briner was a member of Fund GP owning fifty percent of its membership interest.

211.    This claim is not a collusive one to confer on courts of the United States jurisdiction that it would not otherwise have.

212.    Formal demand by Briner upon Fund GP to take action adverse to Roger Saunders would have been futile due to Roger Saunders' veto power, and Briner will fairly and adequately represent the interest of all other owners of Fund GP in enforcing the rights of Fund GP.

213.    As a result of the conduct alleged above, Fund GP has been damaged in that it has been deprived of promote income.

## COUNT FIVE

### (Aiding and Abetting Breach of Fiduciary Duty: Briner and Revere Capital v. Roger Saunders, Sloan Saunders, Saunders Capital, Cedar Hill and Evan Woolley)

214.    Paragraphs 1 through 181 are incorporated herein by reference.

215.   Paragraphs 183 through 189 of Count One are incorporated herein by reference.

216.   In the ways alleged above, Saunders Capital, Cedar Hill and Evan Woolley assisted Roger Saunders and/or Sloan Saunders in breaching their respective fiduciary duties owed to Briner and Revere Capital.

217.   In the ways alleged above, Sloan Saunders assisted Roger Saunders, and Roger Saunders assisted Sloan Saunders, in each others' breaches of fiduciary duties owed to Briner and Revere Capital.

218.   The assistance alleged in ¶¶ 216-217 above was substantial, and in providing such assistance Saunders Capital, Cedar Hill, Evan Woolley, Roger Saunders and Sloan Saunders were each generally aware they were part of illegal or tortious activity, and they did so knowingly and to assist in illegal or tortious activity.

219.   As a result of the conduct alleged above, Briner and Revere Capital have been damaged in that they have been deprived of Interest Spread Profit Rate and Interest-on-Points-Profit and/or Points Profit, promote income, profitable investment opportunities, fees pursuant to § 5.8 of the Revere Investments Operating Agreement and/or management fees pursuant to § 5.3 of the Fund LP Agreement and/or they have incurred or been forced to absorb unwarranted professional fees and legal fees and/or have not been reimbursed for proper expenses.

### COUNT SIX

**(Derivative Claim by Revere Capital on behalf of Revere Investments v. Roger Saunders, Sloan Saunders, Saunders Capital, Cedar Hill and Woolley for Aiding and Abetting Breaches of Fiduciary Duty)**

220.   Paragraphs 1 through 181 are incorporated herein by reference.

221.   Paragraphs 183 through 189 of Count One are incorporated herein by reference.

222.   Paragraphs 216 through 218 of Count Five are incorporated herein by reference.

223.   This is a claim by way of a member's derivative action brought pursuant to Fed. R. Civ. P. 23.1.

224.   At all relevant times, Revere Capital was a member of Revere Investments owning fifty percent of its membership interests.

225.   This claim is not a collusive one to confer on courts of the United States jurisdiction that it would not otherwise have.

226.   Formal demand by Revere Capital upon Revere Investments to take action adverse to Roger and Sloan Saunders would be futile due to Sloan Saunders' veto power, and Revere Capital will fairly and adequately represent the interest of all owners of Revere Investments in enforcing the rights of Revere Investments.

227.   As a result of the conduct alleged above, Revere Investments has been damaged, in that it has been deprived of Interest Rate Spread Profit, Interest-on-Points Profit and/or Points Profit, promote income and/or fees pursuant to § 5.3 of the Fund LP Agreement, and/or it has incurred and/or been forced to absorb unwarranted professional fees and has not been reimbursed for proper expenses.

**COUNT SEVEN**

**(Breach of Contract:  Revere Capital v. Roger Saunders and Sloan Saunders)**

228.   Paragraphs 1 through 181 are incorporated herein by reference.

229.    In the ways alleged above, Rogers Saunders and Sloan Saunders have breached the Revere Investments' Operating Agreement.

230.    As a result of such breach, Revere Capital has been damaged, in that it has been deprived of Interest Rate Spread Profit, Interest-On-Points Profit and/or Points Profit, promote income, profitable investment opportunities, management fees pursuant to § 5.3 of the Fund LP Agreement and/or fees pursuant to § 5.8 of the Revere Investments Operating Agreement and/or it has not been reimbursed for proper expenses and/or has incurred legal fees.

## COUNT EIGHT

**(Implied Covenant of Good Faith:  Revere Capital v. Roger Saunders and Sloan Saunders)**

231.    Paragraphs 1 through 181 are incorporated herein by reference.

232.    Revere Capital reasonably expected to receive certain benefits under the Revere Investments' Operating Agreement.

233.    In the ways alleged above, Roger Saunders and Sloan Saunders engaged in conduct that injured Revere Capital's right to receive some or all of the benefits alleged above.

234.    In committing the acts by which they injured Revere Capital's right to receive benefits that it reasonably expected to receive under the Revere Investments' Operating Agreement, as alleged in ¶ 233 above, Roger Saunders and Sloan Saunders acted in bad faith.

235.    As a result of the conduct alleged above, Revere Capital has been damaged in that it has been deprived of Interest Rate Spread Profit, Interest-on-Points Profit and/or Points Profit, promote income, profitable investment opportunities, management fees pursuant to § 5.3 of the

Fund LP Agreement and/or fees pursuant to § 5.8 of the Revere Investments Operating Agreement and/or it has not been reimbursed for proper expense and/or has incurred legal fees.

## COUNT NINE

### (Breach of Contract: Briner v. Roger Saunders)

236.   Paragraphs 1 through 181 are incorporated herein by reference.

237.   In the ways alleged above, Rogers Saunders breached the Fund GP Operating Agreement.

238.   As a result of the breaches alleged above, Briner has been damaged, in that he has been deprived of promote income

## COUNT TEN

### (Implied Covenant of Good Faith: Briner v. Roger Saunders)

239.   Paragraphs 1 through 181 are incorporated herein by reference.

240.   Briner reasonably expected to receive certain benefits under the Fund GP Operating Agreement.

241.   In the ways alleged above, Roger Saunders engaged in conduct that injured Clark Briner's right to receive some or all of the benefits alleged in ¶ 240 above.

242.   In committing the acts by which he injured Clark Briner's right to receive benefits that he reasonably expected to receive under the Fund GP Operating Agreement, as alleged in ¶ 241 above, Roger Saunders acted in bad faith.

243.   As a result of the conduct alleged above, Briner has been damaged, in that he has been deprived of promote income and/or profitable investment opportunities and/or has not been reimbursed for proper expenses and/or has incurred legal fees.

### COUNT ELEVEN

**(Fraud:  Briner and Revere Capital v. Roger Saunders and Sloan Saunders)**

244.   Paragraphs 1 through 181 are incorporated herein by reference.

245.   In the ways alleged above, Roger Saunders and Sloan Saunders committed fraud as against Briner and Revere Capital.

246.   As a result of such fraud, Briner and Revere Capital have been damaged in that they have been deprived of Interest Rate Spread Profit and Interest-on-Points-Profit and/or Points Profit, promote income, profitable investment opportunities, fees pursuant to § 5.8 of the Revere Investments Operating Agreement and/or management fees pursuant to § 5.3 of the Fund LP Agreement and/or they have incurred unnecessary professional fees and legal fees and/or have not been reimbursed for proper expenses.

### COUNT TWELVE

**(Derivative Claim by Revere Capital on behalf of Revere Investments for Fraud v. Roger Saunders and Sloan Saunders)**

247.   Paragraphs 1 through 181 are incorporated herein by reference.

248.   In the ways alleged above, Roger Saunders and Sloan Saunders have committed fraud as against Revere Investments.

249.    This is a claim by way of a member's derivative action brought pursuant to Fed.
R. Civ. P. 23.1.

250.    At all relevant times, Revere Capital was a member of Revere Investments
owning fifty percent of its membership interests.

251.    This claim is not a collusive one to confer on courts of the United States
jurisdiction that it would not otherwise have.

252.    Formal demand by Revere Capital upon Revere Investments to take action
adverse to Roger and Sloan Saunders would be futile due to Sloan Saunders' veto power, and
Revere Capital will fairly and adequately represent the interest of all owners of Revere
Investments in enforcing the rights of Revere Investments.

253.    As a result of the fraudulent conduct alleged above, Revere Investments has been
damaged, in that it has been deprived of Interest Rate Spread Profit, Interest-on-Points Profit
and/or Points Profit, promote income and/or fees pursuant to § 5.3 of the Fund LP Agreement,
and/or it has incurred and/or been forced to absorb unwarranted professional fees and has not
been reimbursed for proper expenses.

## COUNT THIRTEEN

### (Derivative Claim for Fraud by Briner and Fund GP on behalf of the Fund v. Roger Saunders and Sloan Saunders)

254.    Paragraphs 1 through 181 are incorporated herein by reference.

255.    In the ways alleged above, Roger Saunders and Sloan Saunders have committed
fraud as against the Fund.

256.   This is a derivative action brought pursuant to Fed. R. Civ. P. 23.1 by Briner as member of Fund GP and the Fund GP as general partner of the Fund, on behalf of the Fund.

257.   At all relevant times, Briner was a member of Fund GP owning fifty percent of its membership interests.

258.   At all relevant times Fund GP possessed all management control with respect to the affairs of the Fund.

259.   This claim is not a collusive one to confer on courts of the United States jurisdiction that it would not otherwise have.

260.   Formal demand by Briner upon Fund GP to take action adverse to Roger Saunders would have been futile due to Roger Saunders' veto power, and Briner and Fund GP will fairly and adequately represent the interest of all other owners of the Fund in enforcing the rights of the Fund.

261.   As a result of the conduct alleged above, the Fund has been damaged, in that it has been deprived of profitable investment opportunities and/or has incurred and/or been forced to absorb unwarranted professional fees.

## COUNT FOURTEEN

### (Derivative Claim for Fraud by Briner on behalf of Fund GP
### v. Roger Saunders and Sloan Saunders)

262.   Paragraphs 1 through 181 are incorporated herein by reference.

263.   In the ways alleged above, Roger Saunders and Sloan Saunders have committed fraud as against the Fund GP.

264.    This is a claim by way of a member's derivative action brought pursuant to Fed. R. Civ. P. 23.1.

265.    At all relevant times, Briner was a member of Fund GP owning fifty percent of its membership interests.

266.    This claim is not a collusive one to confer on courts of the United States jurisdiction that it would not otherwise have.

267.    Formal demand by Briner upon Fund GP to take action adverse to Roger Saunders would have been futile due to Roger Saunders' veto power, and Briner will fairly and adequately represent the interest of all owners of Fund GP in enforcing the rights of Fund GP.

268.    As a result of the conduct alleged above, Fund GP has been damaged, in that it has been deprived of promote income.

### COUNT FIFTEEN

### (Aiding and Abetting Fraud:  Briner and Revere Capital v. Roger Saunders, Sloan Saunders, Saunders Capital, Cedar Hill and Woolley)

269.    Paragraphs 1 through 181 are incorporated herein by reference.

270.    Paragraphs 245 of Count Eleven is incorporated herein by reference.

271.    In the ways alleged above, Saunders Capital, Cedar Hill and Evan Woolley assisted Roger Saunders and/or Sloan Saunders in defrauding Briner and Revere Capital.

272.    In the ways alleged above, Roger Saunders assisted Sloan Saunders, and Sloan Saunders assisted Roger Saunders, in each others' fraudulent conduct as against Briner and Revere Capital.

273.    The assistance alleged above was substantial, and in providing such assistance Roger Saunders, Sloan Saunders, Saunders Capital, Cedar Hill and Woolley were each generally aware of their roles as part of overall illegal or tortious activity, and did so knowingly to assist in such illegal or tortious activity.

274.    As a result of the conduct alleged above, Briner and Revere Capital have been damaged, in that they have been deprived of Interest Rate Spread Profit and Interest-on-Points-Profit and/or Points Profit, promote income, profitable investment opportunities, fees pursuant to § 5.8 of the Revere Investments Operating Agreement and/or management fees pursuant to § 5.3 of the Fund LP Agreement and/or they have incurred and/or been forced to absorb unwarranted professional fees and legal fees and/or have not been reimbursed for proper expenses.

**COUNT SIXTEEN**

**(Derivative Claim for Aiding and Abetting Fraud by Revere Capital on behalf of Revere Investments v. Roger Saunders, Sloan Saunders, Saunders Capital, Cedar Hill and Woolley)**

275.    Paragraphs 1 through 181 are incorporated herein by reference.

276.    Paragraph 245 of Count Eleven is incorporated herein by reference.

277.    In the ways alleged above, Saunders Capital, Cedar Hill and Evan Woolley assisted Roger Saunders and/or Sloan Saunders in defrauding Revere Investments.

278.    In the ways alleged above, Roger Saunders assisted Sloan Saunders and Sloan Saunders assisted Roger Saunders, in each others' fraudulent conduct as against Revere Investments.

279.    This is a claim by way of a member's derivative action brought pursuant to Fed. R. Civ. P. 23.1.

280.    At all relevant times, Revere Capital was a member of Revere Investments owning fifty percent of its membership interest.

281.    This claim is not a collusive one to confer on courts of the United States jurisdiction that it would not otherwise have.

282.    Formal demand by Revere Capital upon Revere Investments to take action adverse to Roger and Sloan Saunders would be futile due to Sloan Saunders' veto power, and Revere Capital will fairly and adequately represent the interest of all other owners of Revere Investments in enforcing the rights of Revere Investments.

283.    As a result of the fraudulent conduct alleged above, Revere Investments has been damaged, in that it has been deprived of Interest Rate Spread Profit and Interest-on-Points-Profit and/or Points Profit, promote income, profitable investment opportunities, fees pursuant to § 5.8 of the Agreement and/or management fees pursuant to § 5.3 of the Fund LP Agreement and/or they have incurred and/or been forced to absorb unwarranted professional fees and legal fees and/or have not been reimbursed for proper expenses.

### COUNT SEVENTEEN

**(Derivative Claim for Aiding and Abetting Fraud by Briner and Fund GP on behalf of the Fund v. Roger Saunders, Sloan Saunders, Saunders Capital, Cedar Hill and Woolley)**

284.    Paragraphs 1 through 181 are incorporated herein by reference.

285.    Paragraph 245 of Count Eleven is incorporated herein by reference.

286.    In the ways alleged above, Saunders Capital, Cedar Hill and Evan Woolley assisted Roger Saunders and/or Sloan Saunders in defrauding the Fund.

287.    In the ways alleged above, Roger Saunders assisted Sloan Saunders, and Sloan Saunders assisted Roger Saunders, in each others' fraudulent conduct as against the Fund.

288.    This is a derivative action brought pursuant to Fed. R. Civ. P. 23.1 on behalf of the Fund by one of the members of Fund GP which in turn is general partner of the Fund.

289.    At all relevant times, Briner was a member of Fund GP owning fifty percent of its membership interests.

290.    At all relevant times Fund GP possessed all management control with respect to the affairs of the Fund.

291.    This claim is not a collusive one to confer on courts of the United States jurisdiction that it would not otherwise have.

292.    Formal demand by Briner upon Fund GP to take action adverse to Roger Saunders would have been futile due to Roger Saunders' veto power, and Briner and Fund GP will fairly and adequately represent the interest of all owners of the Fund in enforcing the rights of the Fund.

293.    As a result of the conduct alleged above, the Fund has been damaged, in that it has been deprived of profitable investment opportunities and/or has incurred unnecessary professional fees.

## COUNT EIGHTEEN

### (Derivative Claim for Aiding and Abetting Fraud by Briner on behalf of the Fund GP v. Roger Saunders, Sloan Saunders, Saunders Capital, Cedar Hill and Woolley)

294.    Paragraphs 1 through 181 are incorporated herein by reference.

295.    Paragraph 245 of Count Eleven is incorporated herein by reference.

296.    In the ways alleged above, Saunders Capital, Cedar Hill and Evan Woolley

assisted Roger Saunders and/or Sloan Saunders in defrauding Fund GP.

297.    In the ways alleged above, Roger Saunders assisted Sloan Saunders and Sloan

Saunders assisted Roger Saunders, in each others' fraudulent conduct as against Fund GP.

298.    This is a claim by way of a member's derivative action brought pursuant to Fed.

R. Civ. P. 23.1.

299.    At all relevant times, Briner was a member of Fund GP owning fifty percent of its

membership interests.

300.    This claim is not a collusive one to confer on courts of the United States

jurisdiction that it would not otherwise have.

301.    Formal demand by Briner upon Fund GP to take action adverse to Roger

Saunders would have been futile due to Roger Saunders' veto power, and Briner and Fund GP

will fairly and adequately represent the interest of all owners of Fund GP in enforcing the rights

of Fund GP.

302.    As a result of the conduct alleged above, Fund GP has been damaged, in that it

has been deprived of promote income.

## COUNT NINETEEN

### (Tortious Interference:  Briner, Revere Capital, Hedge Fund, RCM and Revere GP v. Roger Saunders and Sloan Saunders)

303.    Paragraphs 1 through 181 are incorporated herein by reference.

304.    At all relevant times, Briner, Revere Capital, Hedge Fund, RCM and Revere GP had beneficial relationships and business expectancies with investors, wealth managers acting on behalf of investors, employees, independent contractors and professionals.

305.    At all relevant times, Roger Saunders and Sloan Saunders knew of the relationships and business expectancies alleged above.

306.    In the ways alleged above, Roger Saunders and Sloan Saunders intended to, and did interfere with the relationships and business expectancies alleged in ¶ 304 above.

307.    The interference alleged above was not privileged and was effected with improper motive and/or improper means and/or through fraud and/or intimidation.

308.    As a result of the conduct alleged above, Briner, Revere Capital, the Hedge Fund, RCM and Revere GP have been damaged in that they have been deprived of profitable investment opportunities, they have incurred legal fees, and their reputation among investors with whom they have existing and potential beneficial business relationships and business expectancies has been impaired.

## COUNT TWENTY

**(Aiding and Abetting Tortious Interference: Briner, Revere Capital, the Hedge Fund, RCM and Revere GP v. Roger Saunders, Sloan Saunders, Saunders Capital, Cedar Hill and Woolley)**

309.    Paragraphs 1 through 181 are incorporated herein by reference.

310.    Paragraphs 304 through 307 of Count Nineteen are incorporated herein by reference.

311.    In the ways alleged above, Saunders Capital, Cedar Hill and Evan Woolley assisted Roger Saunders and/or Sloan Saunders in the tortious interferences as alleged above.

312.    In the ways alleged above Roger Saunders assisted Sloan Saunders, and Sloan Saunders assisted Roger Saunders, in each others' tortious interferences as alleged above.

313.    The assistance alleged in ¶¶ 311-312 above was substantial, and in providing such assistance Roger Saunders, Sloan Saunders, Saunders Capital, Cedar Hill and Evan Woolley were generally aware of their roles as part of overall illegal or tortious activity, and did so knowingly to assist in such illegal or tortious activity.

314.    As a result of the conduct alleged above, Briner, Revere Capital, the Hedge Fund and Revere GP have been damaged in that they have been deprived of profitable investment opportunities, they have incurred legal fees and their reputation among investors with whom they have existing and potential beneficial relationships and business expectancies have been impaired.

## COUNT TWENTY-ONE

**(Abuse of Process:  Briner, Revere Capital, Revere Capital Management and Hedge Fund v. Roger Saunders)**

315.  Paragraphs 1 through 181 are incorporated herein by reference.

316.  In the ways alleged above, in this matter Roger Saunders has used the legal process to accomplish a purpose for which it is not designed.

317.  In using the legal process to accomplish a purpose for which it was not designed, Roger Saunders has committed acts, as alleged above, in the use of legal process which are not proper in the regular prosecution of such a proceeding.

318.  As a result of the abuse of process alleged above, Briner, Revere Capital, Revere Capital Management and the Hedge Fund have been damaged, in that they have been deprived of profitable investment opportunities, they have incurred legal fees, and their reputation among investors with whom they have existing and potential beneficial business relationships and business expectancies have been impaired.

## COUNT TWENTY-TWO

**(Aiding and Abetting Abuse of Process:  Briner, Revere Capital, RCM and Hedge Fund v. Sloan Saunders)**

319.  Paragraphs 1 through 181 are incorporated herein by reference.

320.  Paragraphs 316 and 317 of Count Twenty-One are incorporated herein by reference.

321.    In the ways alleged above, Sloan Saunders assisted Roger Saunders and/or Sloan Saunders assisted Roger Saunders in the conduct alleged in ¶¶ 317 and 318 of Count Twenty-One.

322.    The assistance alleged in ¶ 321 above was substantial, and in providing such assistance Sloan Saunders was generally aware of his role as part of overall illegal or tortious activity, and he did so knowingly to assist in such illegal or tortious activity.

323.    As a result of the conduct alleged above, Briner, Revere Capital, RCM and the Hedge Fund have been damaged, in that they have been deprived of profitable investment opportunities, they have incurred legal fees, and their reputation among investors with whom they have existing and potential beneficial business relationships and business expectancies have been impaired.

## COUNT TWENTY-THREE

### (CUTPA:  Briner and Revere Capital v. Roger Saunders, Sloan Saunders, Saunders Capital and Cedar Hill)

324.    Paragraphs 1 through 181 are incorporated herein by reference.

325.    In competing with Revere Investments and the Fund, Roger Saunders, Sloan Saunders, Saunders Capital and Cedar Hill have committed unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et. seq.*

326.    As a result of the conduct alleged above, Briner and Revere Capital have suffered ascertainable loss, in that they have been deprived of Interest Rate Spread Profit, Interest-on-

Points Profit and/or Points Profit, promote income, profitable investment opportunities and/or management fees pursuant to § 5.3 of the Fund LP Agreement.

## COUNT TWENTY-FOUR

### (Derivative CUTPA Claim by Revere Capital on behalf of Revere Investments v. Roger Saunders, Sloan Saunders, Saunders Capital and Cedar Hill)

327.   Paragraphs 1 through 181 are incorporated herein by reference.

328.   Paragraph 325 of Count Twenty-Three is incorporated herein by reference.

329.   This is a claim by way of a member's derivative action brought pursuant to Fed. R. Civ. P. 23.1.

330.   At all relevant times Revere Capital was a member of Revere Investments owning fifty percent of its membership interests.

331.   This claim is not a collusive one to confer on courts of the United States jurisdiction that it would not otherwise have.

332.   Formal demand by Revere capital upon Revere Investments to take action adverse to Roger and Sloan Saunders would be futile due to Sloan Saunders' veto power, and Revere Capital will fairly and adequately represent the interest of all owners of Revere Investments in enforcing the rights of Revere Investments.

333.   As a result of the conduct alleged above, Revere Capital has suffered ascertainable loss, in that it has been deprived of Interest Rate Spread Proft, Interest-on-Points Profit and/or Points Profit, promote income, profitable investment opportunities and/or management fees pursuant to § 5.3 of the Fund LP Agreement, it has incurred and/or been forced

to absorb unwarranted professional fees and/or legal fees, and/or it has not been reimbursed for proper expenses.

## COUNT TWENTY-FIVE

### (Derivative CUTPA Claim by Briner and Fund GP on behalf of the Fund v. Roger Saunders, Sloan Saunders, Saunders Capital and Cedar Hill)

334.    Paragraphs 1 through 181 are incorporated herein by reference.

335.    Paragraph 325 Count Twenty-Three is incorporated herein by reference.

336.    This is a derivative action brought pursuant to Fed. R. Civ. P. 23.1 by Briner as member of Fund GP and the Fund GP as general partner of the Fund, on behalf of the Fund.

337.    At all relevant times Briner was a member of Fund GP owning fifty percent of its membership interests.

338.    At all relevant times Fund GP possessed all management control with respect to the affairs of the Fund.

339.    This claim is not a collusive one to confer on courts of the United States jurisdiction that it would not otherwise have.

340.    Formal demand by Briner upon Fund GP to take action adverse to Roger Saunders would have been futile due to Roger Saunders' veto power, and Briner and Fund GP will fairly and adequately represent the interest of all owners of the Fund in enforcing the rights of the Fund.

341.    As a result of the conduct alleged above, the Fund has been damaged in that it has been deprived Interest Rate Spread Profit, Interest-on-Points Profit and/or Points Profit and/or

profitable investment opportunities, it has incurred and/or been forced to absorb unwarranted

professional fees and/or legal fees.

## COUNT TWENTY-SIX

### (Derivative CUTPA Claim by Briner on behalf of Fund GP v. Roger Saunders, Sloan Saunders, Saunders Capital and Cedar Hill)

342.    Paragraphs 1 through 181 are incorporated herein by reference.

343.    Paragraph 325 of Count Twenty-Three is incorporated herein by reference.

344.    This is a claim by way of a member's derivative action brought pursuant to Fed.

R. Civ. P. 23.1.

345.    At all relevant times Briner was a member of Fund GP owning fifty percent of its

membership interests.

346.    This claim is not a collusive one to confer on courts of the United States

jurisdiction that it would not otherwise have.

347.    Formal demand by Briner upon Fund GP to take action adverse to Roger

Saunders would have been futile due to Roger Saunders' veto power, and Briner will fairly and

adequately represent the interest of all owners of Fund GP in enforcing the rights of Fund GP.

348.    As a result of the conduct alleged above, Fund GP has been damaged in that it has

been deprived of promote income.

## COUNT TWENTY-SEVEN

### (Claim for Unjust Enrichment:  Briner and Revere Capital v. Roger Saunders, Sloan Saunders, Saunders Capital and Cedar Hill)

349.    Paragraphs 1 through 181 are incorporated herein by reference.

350.     As a result of the conduct alleged above, Roger Saunders, Sloan Saunders, Saunders Capital and Cedar Hill have obtained benefits conferred by Briner and/or Revere Capital under circumstances that are unjust.

351.     The benefits alleged in ¶ 350 above consist of Interest Rate Spread Profit, Interest-On-Points Profit, and Points Profit, profitable investment opportunities and management fees pursuant to § 5.3 of the Fund LP Agreement and/or the benefit of non-payment of fees pursuant to § 5.8 of the Revere Investments Operating Agreement, all of which benefits should be disgorged.

## COUNT TWENTY-EIGHT

### (Derivative Claim for Unjust Enrichment by Briner and Fund GP on behalf of the Fund v. Roger Saunders, Sloan Saunders, Saunders Capital and Cedar Hill)

352.     Paragraphs 1 through 181 are incorporated herein by reference.

353.     As a result of the conduct alleged above, Roger Saunders, Sloan Saunders, Saunders Capital and Cedar Hill have obtained benefits conferred by the Fund under circumstances that are unjust.

354.     This is a derivative action brought pursuant to Fed. R. Civ. P. 23.1 by Briner as member of Fund GP and the Fund GP as general partner of the Fund, on behalf of the Fund.

355.     At all relevant times, Briner was a member of Fund GP owning fifty percent of its membership interests.

356.     At all relevant times Fund GP possessed all management control with respect to the affairs of the Fund.

357.     This claim is not a collusive one to confer on courts of the United States jurisdiction that it would not otherwise have.

358.     Formal demand by Briner upon Fund GP to take action adverse to Roger Saunders would have been futile due to Roger Saunders' veto power, and Briner and Fund GP will fairly and adequately represent the interest of all owners of the Fund in enforcing the rights of the Fund.

359.     The benefits alleged in ¶ 353 above consist of Interest Rate Spread Profit, Interest-on-Points Profit, and Points Profit, profitable investment opportunities, management fees pursuant to § 5.3 of the Fund LP Agreement, all of which benefits should be disgorged.

## COUNT TWENTY-NINE

### (Derivative Claim for Unjust Enrichment by Briner on behalf of Fund GP v. Roger Saunders, Sloan Saunders, Saunders Capital and Cedar Hill)

360.     Paragraphs 1 through 181 are incorporated herein by reference.

361.     As a result of the conduct alleged above, Roger Saunders, Sloan Saunders, Saunders Capital and Cedar Hill have obtained benefits conferred by Fund GP under circumstances that are unjust.

362.     This is a claim by way of a member's derivative action brought pursuant to Fed. R. Civ. P. 23.1.

363.     At all relevant times, Briner was a member of Fund GP owning fifty percent of its membership interest.

364.    This claim is not a collusive one to confer on courts of the United States jurisdiction that it would not otherwise have.

365.    Formal demand by Briner upon Fund GP to take action adverse to Roger Saunders would have been futile due to Roger Saunders' veto power, and Briner will fairly and adequately represent the interest of all owners of Fund GP in enforcing the rights of Fund GP.

366.    The benefits alleged in Paragraph 361 above consist of promote income effectively diverted to Roger Saunders, Sloan Saunders, Saunders Capital and Cedar Hill, all of which benefits should be disgorged.

## COUNT THIRTY

### (Declaratory Judgment:  Briner and Revere Capital v. Roger Saunders and Sloan Saunders)

367.    Paragraphs 1 through 181 are incorporated herein by reference.

368.    In the ways alleged above Briner and Revere Capital had interests in the Impounded Funds and in other monies as to which there is uncertainty as to their rights or other general relations.

369.    In the ways alleged above, there is an actual bona fide and substantial question or issue in dispute concerning the matters alleged above, which requires settlement between the parties.

## COUNT THIRTY-ONE

### (Derivative Claim for Declaratory Judgment by Revere Capital on behalf of Revere Investments v. Roger Saunders, Fund GP and the Fund)

370.    Paragraphs 1 through 181 are incorporated herein by reference.

371.    In the ways alleged above Revere Investments has an interest in the Impounded Funds and in other monies as to which there is uncertainty as to their rights or other general relations.

372.    In the ways alleged above, there is an actual bona fide and substantial question or issue in dispute concerning the matters referred to in ¶ 371 above, which requires settlement between the parties.

373.    This is a claim by way of a member's derivative action brought pursuant to Fed. R. Civ. P. 23.1.

374.    At all relevant times, Revere Capital was a member of Revere Investments owning fifty percent of its membership interests.

375.    This claim is not a collusive one to confer on courts of the United States jurisdiction that it would not otherwise have.

376.    Formal demand by Revere Capital upon revere Investments to take action adverse to Roger and Sloan Saunders would be futile due to Sloan Saunders' veto power, and Revere Capital will fairly and adequately represent the interest of all owners of Revere Investments in enforcing the rights of Revere Investments.

## COUNT THIRTY-TWO

### (Derivative Claim for Declaratory Judgment by Briner and Fund GP on behalf of the Fund v. Roger Saunders and Sloan Saunders)

377.    Paragraphs 1 through 181 are incorporated herein by reference.

378.    In the ways alleged above the Fund has an interest in the Impounded Funds and in other monies as to which there is uncertainty as to their rights or other general relations.

379.    In the ways alleged above, there is an actual bona fide and substantial question or issue in dispute concerning the matters referred to in ¶ 378 above, which requires settlement between the parties.

380.    This is a derivative action brought pursuant to Fed. R. Civ. P. 23.1 by Briner as member of Fund GP and the Fund GP as general partner of the Fund, on behalf of the Fund.

381.    At all relevant times, Briner was a member of Fund GP owning fifty percent of its membership interest.

382.    At all relevant times Fund GP possessed all management control with respect to the affairs of the Fund.

383.    This claim is not a collusive one to confer on courts of the United States jurisdiction that it would not otherwise have.

384.    Formal demand by Briner upon Fund GP to take action adverse to Roger Saunders would have been futile due to Roger Saunders' veto power, and Briner and Fund GP will fairly and adequately represent the interest of all other owners of the Fund in enforcing the rights of the Fund.

## COUNT THIRTY-THREE

### (Derivative Claim for Declaratory Judgment by Briner on behalf of Fund GP v. Roger Saunders, Sloan Saunders and Revere Investments)

385.    Paragraphs 1 through 181 are incorporated herein by reference.

386.   In the ways alleged above Fund GP has an interest in the Impounded Funds and in other monies as to which there is uncertainty as to their rights or other general relations.

387.   In the ways alleged above, there is an actual bona fide and substantial question or issue in dispute concerning the matters referred to in ¶ 386 above, which requires settlement between the parties.

388.   This is a claim by way of a member's derivative action brought pursuant to Fed. R. Civ. P. 23.1.

389.   At all relevant times, Briner was a member of Fund GP owning fifty percent of its membership interests.

390.   This claim is not a collusive one to confer on courts of the United States jurisdiction that it would not otherwise have.

391.   Formal demand by Briner upon Fund GP to take action adverse to Roger Saunders would have been futile due to Roger Saunders' veto power, and Briner will fairly and adequately represent the interest of all owners of Fund GP in enforcing the rights of Fund GP.

WHEREFORE, the Counterclaim Plaintiffs claim:

1.   Money damages;
2.   A declaratory judgment;
3.   Punitive damages and attorneys fees pursuant to Conn. Gen Stat. § 42-110a, *et seq.* and common law;
4.   Pre- and post-judgment interest;
5.   Costs;
6.   Such other relief as may be appropriate.

THE DEFENDANT/COUNTERCLAIM PLAINTIFFS,
CLARK BRINER, REVERE CAPITAL LLC,
REVERE CAPITAL MANAGEMENT, LLC AND
REVERE HIGH YIELD FUND, L.P.

By: /s/ David S. Hoopes
    David S. Hoopes
    Peter J. Royer
    Mayo Crowe LLC
    CityPlace II
    185 Asylum Street
    Hartford, CT 06103-3426
    Telephone: (860) 275-6800
    Fax: (860) 275-6819
    E-mail: dhoopes@mayocrowe.com
    Federal Bar No.: CT06069
    Its Attorneys

## CERTIFICATION

I hereby certify that on May 29, 2013, a copy of the foregoing Answer, Affirmative Defenses and Counterclaim was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ David S. Hoopes
David S. Hoopes
Peter J. Royer
Mayo Crowe LLC
Attorneys for Clark Briner (for himself and by way of derivative action on behalf of Revere High Yield GP, LLC and Revere High Yield Debt Fund, L.P., Revere Capital, LLC (Texas), Revere Capital Management, LLC and Revere High Yield Fund, L.P.
CityPlace II
185 Asylum Street
Hartford, CT 06103-3426
Telephone: (860) 275-6800
Fax:  (860) 275-6819
E-mail:  dhoopes@mayocrowe.com
Federal Bar No.:  CT06069
Its Attorneys

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

------------------------------------------------- :

**Roger L. Saunders**                    :      **CIVIL ACTION**
                                         :      **NO. _:__CV-___(___)**
**vs.**                                  :
                                         :
**Clark Briner, et al.**                 :
                                         :      **MAY __, 2013**

------------------------------------------------- :

## VERIFICATION

Clark Briner, undersigned, a Counterclaim Plaintiff in this action and on behalf of all Counterclaim Plaintiffs, hereby verifies that he has read the foregoing Verified Counterclaim and that the allegations contained therein, to the best of his knowledge, are true and correct, except with respect to those allegations made upon information and belief, as to which allegations he verified that he believes them to be true.

_____
Clark Briner

Sworn to and subscribed before me this 28ᵗʰ day of May, 2013.

_____

Notary Public
My Commission Expires:

VANESSA P RAMIREZ
Notary Public
Connecticut
My Commission Expires Aug 31, 2017

C:\Users\Clark\Dropbox\Scudder Cottages\CLARK PERSONAL - SAUNDERS\Litigation\Mayo\Crowe\counterclaim_5.doc                    82